**UNITED STATES of America**

v.

**Melvin A. SLAWIK, Appellant, and Bruce A. Uffelman et al.**

**No. 76–1541.**

United States Court of Appeals, Third Circuit.

Argued Oct. 22, 1976.

Decided Jan. 3, 1977.

W. Laird Stabler, Jr., U. S. Atty., Alan J. Hoffman, Asst. U. S. Atty., Wilmington, Del., for appellee.

Bruce M. Stargatt, Richard A. Zappa, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for appellant.

Before ALDISERT and GIBBONS, Circuit Judges, and McGLYNN,* District Judge.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

Melvin A. Slawik appeals from a judgment of sentence imposed pursuant to a jury verdict finding him guilty on three counts of making false declarations before a

* Joseph L. McGlynn, Jr. of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

grand jury in violation of 18 U.S.C. § 1623.[1] We reverse.

Slawik, at the time of trial, was the elected County Executive of New Castle County, Delaware. His indictment grew out of a federal investigation of the relationship between contractors and various New Castle County public officials.[2] In the course of that investigation the United States Attorney became aware that one Bayard Austin, a former political associate of Slawik, might have relevant information.

Austin, then living in Orlando, Florida, was interviewed there by F.B.I. Agents on August 4, 1974. Austin asserted the fifth amendment privilege against self-incrimination. On August 8, 1974, the agents advised Austin they were authorized to grant him immunity from prosecution. With this assurance, he gave the agents a statement about various matters in New Castle County. They discussed installing a recording device on Austin's telephone and Austin's using a concealed recording device on his person, in order to record conversation between Austin and his former New Castle County associates.

---

1. The statute, 18 U.S.C. § 1623 (1970), provides that:

(a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years or both.

(b) This section is applicable whether the conduct occurred within or without the United States.

(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

(1) each declaration was material to the point in question, and

(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence.

Slawik was initially charged in a thirteen-count indictment, alleging: conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 (Count 1); obstruction of justice, in violation of 18 U.S.C. §§ 1510 and 1503 (Counts 2 and 3); conspiracy to violate and violation of the Travel Act, in violation of 18 U.S.C. §§ 371 and 1952 (Counts 4, 5, and 6); making false declarations before a grand jury, in violation of 18 U.S.C. § 1623 (Counts 7, 8, and 9); conspiracy to obtain a bribe, in violation of 18 U.S.C. § 371 (Count 10); conspiracy to violate and violations of the Travel Act by obtaining a bribe, in violation of 18 U.S.C. § 1952(a) (Counts 11 and 12); and subornation of perjury and influencing a witness with respect to testimony concerning the alleged bribes, in violation of 18 U.S.C. §§ 1622 and 1503 (Count 13).

Counts 4, 5 and 6 of the indictment were dismissed on defendant's motion, for failure to state an offense under the Travel Act. The remaining counts were severed for trial into three groups: (1) Counts 1, 2, and 3; (2) Counts 7, 8, 9, 12 and 13; and (3) Counts 10 and 11. The government elected to try the second group first.

Counts 10, 11, 12 and 13 were dismissed on the first day of trial, with prejudice, on the government's motion. Counsel have advised the court that Counts 1, 2, and 3 were disposed of by a plea bargain in which Slawik pleaded guilty to a single count and received a one-year sentence. That sentence was to be served concurrently with the three-year sentence imposed by the judgment appealed from here.

2. A simultaneous state inquiry paralleled the federal investigation.

On October 9, 1974, a recording device was placed on Austin's telephone. Austin then called Slawik who eventually returned his call. Other telephone conversations followed. On October 14, 1974, Austin, Slawik, and three other New Castle County associates met in Florida. Austin's concealed recording device was running. Throughout the telephone conversations and the meeting, Austin maintained the pretense that he was not yet cooperating with the F.B.I. He did not disclose that he had been granted immunity. On October 23, 1974 one additional call between Austin and Slawik was recorded. The United States Attorney's office promptly obtained all of the recordings described above.

Slawick was subpoenaed to testify before a federal grand jury in Wilmington, Delaware on December 11, 1974. The Assistant United States Attorney who conducted the examination had already studied the tapes. However, he disclosed to Slawik neither their existence nor the fact of Austin's co-operation.[3] The December 11 examination of Slawik covers more than 200 pages of transcript. The charges of making false declarations presently before us arise from that testimony. The principal evidence the government relied on to prove its case is the recordings.

Each of the three counts set forth in identical terms the subject matter of the grand jury's investigation.[4] Each count set forth in identical terms that which the government contended was material to the investigation.[5] In the third paragraph of each count, the indictment set forth a specific material matter as to which Slawik allegedly gave false testimony.[6]

---

**3.** In fact, the government deliberately concealed from Slawik the fact of Austin's cooperation. Assistant U. S. Attorney Hooper, who questioned Slawik in the grand jury room, testified at trial that the government had refrained from asking pointed, direct questions, because that could not be done "without revealing to [Slawik] the extent and nature of Austin's co-operation." Trial Transcript, p. G–61.

**4.** "On the 11th day of December, 1974, in the Judicial District of Delaware, a competent tribunal, a Grand Jury of the United States of America duly empanelled and sworn in the United States District Court for the District of Delaware was conducting an inquiry to determine, among other things, whether there had been committed in the District of Delaware violations of Title 18, United States Code, Section 371 (Conspiracy); Section 1503 (Obstruction of Justice); Section 1510 (Obstruction of Criminal Investigation); Section 1622 (Subornation of Perjury); Section 1951 (Interference of Commerce by Threats or Violence); Section 1952 (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); and Title 26, United States Code, Section 7201 (Tax Evasion), and other Federal criminal statutes, said inquiry being an instance in which a law of the United States authorized an oath to be administered."
Indictment, Counts 7, 8, and 9, paragraph one of each count.

**5.** "2. It was material to this Grand Jury to ascertain, among other things:
(a) the identity and action of any person or persons who may have discussed the aforesaid inquiry with Bayard Austin, a potential Grand Jury witness, and the nature and the results of such conversations with Bayard Austin;
(b) the identity and actions of any person or persons who may have corruptly endeavored to influence, obstruct, and impede the due administration of justice in the United States District Court of the District of Delaware concerning the testimony of potential Grand Jury witnesses, particularly Bayard Austin;
(c) the identity and actions of any person or persons who may have willfully endeavored to prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator;
(d) the identity and actions of any person or persons who may directly benefit by reason of Bayard Austin withholding information concerning the aforesaid inquiry, and whether any benefit was derived by Bayard Austin by reason of withholding information from the aforesaid inquiry, and the nature and result of such benefit, and how it was derived; and,
(e) the identity and actions of any person or persons who might have conspired to commit or committed an offense against the United States, to wit, violations set forth in Paragraph 1 of this Count . . . ."
Indictment, Counts 7, 8, and 9, paragraph two of each count.

**6.** *Count 7:* ". . . in that he did testify falsely with respect to the aforesaid material matters as it relates to his conversations with Bayard Austin . . . as follows: . . . ."
*Count 8:* ". . . in that he did testify falsely with respect to the aforesaid material matters as it relates to his knowledge of

The indictment did not state why or how these three areas of inquiry were matters material to the grand jury's investigation. In a motion for a bill of particulars, Slawik sought to learn, with respect to paragraph three of each count, the material matter which the government did not believe to be true, the reason it was material, and the particularized facts on which the government relied in support of the allegations that the specified testimony was false. The district court sustained the government's refusal to answer those questions. The government did answer, however, a question with respect to the factual basis of the materiality allegations in paragraph 2 of each count: [7]

"The factual basis for the materiality allegations is based upon the fact that the testimony was capable of influencing the tribunal in its investigation and had the natural effect or tendency to influence, impede, hamper, or dissuade the Grand Jury from pursuing its investigation." United States Response to Defendant Melvin A. Slawik's Motion for a Bill of Particulars, Counts 7, 8, and 9.

Materiality is an essential element of a violation of 18 U.S.C. § 1623 and a question of law, decision upon which is reserved to the court.[8] Slawik's statements are set forth in the margin.[9]

others who may have been involved with his conversations with Bayard Austin, and the extent of that involvement . . . as follows: . . . .''

Count 9: ". . . in that he did testify falsely with respect to the aforesaid material matters as it relates to his knowledge of the financing of a house purchased by Bayard Austin and any benefits derived from [sic] Bayard Austin by withholding information from the Grand Jury, and the Federal Bureau of Investigation . . . as follows: . . . .''

7. See note 5 *supra*.

8. *United States v. Weiler*, 143 F.2d 204, 205 (3d Cir. 1944), *rev'd on other grounds*, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Although this court has not recently addressed the question, cases from other Circuits attest to the continuing vitality of this principle. *E. g., United States v. Sisack*, 527 F.2d 917, 920 n.2 (9th Cir. 1976); *United States v. Parr*, 516 F.2d 458, 470 (5th Cir. 1975); *United States v. Romanow*, 509 F.2d 26, 28 (1st Cir. 1975); *Tasby v. United States*, 504 F.2d 332, 337 (8th Cir. 1974), *cert. denied*, 419 U.S. 1125, 95 S.Ct. 811, 42 L.Ed.2d 826 (1975); *United States v. Mancuso*, 485 F.2d 275, 280 (2d Cir. 1973); *United States v. Masters*, 484 F.2d 1251, 1254 (10th Cir. 1973). *See Sinclair v. United States*, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692 (1929) (Pre-§ 1623). *See generally* Annot., 62 A.L. R.2d 1027 (1958).

9. *Count 7:*

Q: Well, as I understand you, you went to the expense of flying down to Florida?
A: That is right. And I paid for it.
Q: To what, just tell him to get an attorney? Why didn't you tell him that over the phone?
A: Because I wanted to talk to him. You know, he is not a guy you can talk to over the phone.

Q: You wanted to talk to him and tell him what?
A: I wanted to talk the situation over with him. First of all, I wanted to appraise him that, you know, look, in my opinion, you don't really have a problem here. First of all, I tried to convince him to come up and testify before the Federal Grand Jury. This is what I did.
Q: So you went there and said you got a subpoena. You got to testify.
A: Can I explain?
Q: Sure. Go right ahead.
■ A: *He said to me, 'If I come up there I will never go back home again.' In his mind, he was done. He was going to be put in jail and that was it. He would never get back to Florida. Those are exactly what his words were. I went down there and said, 'Look, Barney [sic], you will probably only be there a day. Get yourself legal counsel, tell them the truth. They are not going to hold you. You can go back to Florida.'*
*Instead, the FBI said, 'You tell us everything and we will give you immunity down here and you won't have to come up.' I think it would have been better for him to have come up, you know, at that point, and just to tell the truth. So, of course, I was concerned about him.*
Q: So, basically, your trip down there resolved around a discussion with him to convince him to come up here and testify, get it over with, and be truthful?
■ A: *Get the damn thing over with and nobody is going to hold you, nobody is going to do anything.*
Q: How long were you down there?
A: About six, seven hours.
Q: Just down and back?
A: Yes.
*Count 8:*
Q: Did you contact a lawyer down there?
A: No. We contacted a lawyer up here.

Q: Who contacted which lawyer?

A: Well, the lawyer that was contacted was Mr. Arthur Inden and the suggestion came from Danny Rappa. I think Inden is Rappa's lawyer.

Q: So then you must have discussed Austin's situation with Rappa?

A: Yes.

Q: Anybody else?

A: Well, I might have mentioned it to Pete Ross, you know. I mention everything to him. I think I even talked to Tom Luce about it because of the relevance of the Plumco situation.

Q: What did Danny Rappa have to do with this?

A: *Nothing; only insofar as suggesting a lawyer, his lawyer.*

Q: How did it come up, just in casual conversation?

A: *Yes.*

Q: Was he involved in this thing?

A: *Directly, no.*

Q: So you just mentioned it to him casually?

A: *Yes.*

Count 9:

Q: Why should you want to go to Orlando, Florida for 24 hours when Mario was going to discuss a house with Barty Austin?

A: Well, originally, another employee was supposed to go with him who was supposed to make the arrangements. And, kind of, at the last minute Mario said, 'Look, do you want to come with me to see Barty?' I said 'Okay. Basically, I went along for the ride.

Q: I am having a little trouble understanding why Mario would want to help, in May this year, Barty Austin.

A: One of the reasons is that Barty wanted to get a house and get located and didn't want to come back to Delaware. Where, his wife, on the other hand, wanted to come back to Delaware. And Mario was not anxious to have him come back to Delaware and neither was I.

Q: For reasons you have already talked about?

A: That is exactly right.

Q: Did you get a house for him?

A: He already made arrangements. He had the house he wanted and everything. What he needed was for Mario to help him finance it in some way. That was not done at that time. It was done later. I think Mario went back himself to handle that for him.

Q: You mean, the financing was done later?

A: Yes. I think Mario wanted to look at the house to see if his interest was secure, and so on. And Barty got a good deal on the house, you know. It was the kind of thing I think he could protect his money.

Q: So Mario took steps to secure the money that he intends to borrow?

A: Yes. But there, I could not tell you the details. But I do know he assisted him in getting the house. And then he got some power of mortgage on it, or something, you know.

Q: Were you aware of the details of the financing of any sort; were you aware, in fact, that Mario even helped him?

A: Yes, I was aware that Mario helped him.

Q: He just helped him, that is all you know about it?

A: Well, I mean, he helped him secure a mortgage.

Q: Down there.

A: I am not even sure of that by what system he used to secure it. All I went down there that time was to find out what system was involved, how much the house cost, this kind of stuff.

Q: Well, did Mario help him to get the house?

A: Yes, he helped him.

Q: So that Barty would not come back to Delaware?

A: Yes, that was certainly one of the motivations. Meanwhile, you know, Barty is working down there in some corporation that has something to do with Mario anyway, I think.

Q: That seems a little unusual to me for an employer to go down to Florida to make sure that one of his employees secures a house.

A: Well, it might be unusual. It might not be in this case.

Q: I assume that was occasioned by the fact you wanted to keep him down there in Florida?

A: Yeah, that was certainly one of the motivations. Secondly, I really did like to see the guy get located, get working, and get a house, you know, take care of his family. That was part of the motivation too, believe it or not.

Q: But you are not really aware of—

A: I am not a finance man.

Q: You were not involved in this transaction of the arrangements?

A: *I do not know how he got him the mortgage.*

Q: That was Mario's business.

A: Yes. In fact, he did that later. He didn't do it at that time, I don't think.

Q: Did you participate in helping Barty directly in any way?

A: Did I give him any money? No, I did not do anything that way. I looked at the house. I gave him my opinion. It looked like a good deal.

Q: Is it fair to say that as far as you are concerned you went down for the ride, and you have no knowledge of the situation of how Mario helped him get the house?

A: *Yes, except basically what he was interested in was for Mario to help him se-*

### Count 7

To appreciate answer number five,[10] it m**st** be read in context. The examiner's prior questions elicited the answers, not claimed to be false, that Slawik went to Florida to talk to Austin about getting an attorney, and about coming to Wilmington to testify before the grand jury. Answer number five is in response to a paraphrase by the government attorney of this prior testimony:

Q: So you went there and said you got a subpoena. You got to testify.

A: Can I explain?

Q: Sure. Go right ahead.

Answer number six,[11] too, was in response to the government attorney's paraphrase of the prior answer.

It is the government's position that the answers to questions five and six, both referring to a conversation in Florida on October 14, 1974, were understood by the questioner, by Slawik, and by the grand jury to convey:

(1) That Slawik advised Austin to get *independent* legal counsel, as opposed to using counsel provided by a co-conspirator;

(2) That he urged Austin *to testify* before the grand jury and to testify *truthfully*, rather than merely to appear and plead the fifth amendment.

The tape recording of the October 14, 1974 conversation, in the government's possession at the time of Slawik's grand jury appearance, reveals that Slawik certainly was not enthusiastically urging that Austin appear before the grand jury and incriminate Slawik. Nonetheless, answers five and six may be said to paraphrase substantial portions of the transcript of the October 14, 1974 recording, quoted in the margin.[12]

---

cure a loan which probably took Mario's signature which I think is what he did.
(Bracketed numbers and italics added). Although all this testimony was set forth in the indictments, the government narrowed its allegations of falsity in response to Slawik's motion for a bill of particulars. The case, therefore, only concerns those portions of Slawik's grand jury testimony identified by italics, and numbered above in conformity with the government's response to Slawik's motion for a bill of particulars.

10. See note 9, *supra.*

11. See note 9, *supra.*

12. SLAWIK: Right. So we're not, I'm not in any way trying to obstruct justice or anything like that. But, on the other hand, you called me first, when they came down, you know, and I'm giving you the benefit of what seems to me to be good advice. If you proceed along the way you're talking about, you know, that that's not gonna give anybody any trouble. Except, that they're still gonna want you come back to Delaware. Right? And at that point, you gotta consider the fifth. See I'm not so God damn sure. I'll tell you what Billy Brooks did. Billy wouldn't go in. His lawyer went in, for him. Said I'm here, you know. I'm representing, ah, Billy Brooks. Billy Brooks is taking the fifth. Right? And if you have something to indict him on, he'll be here. He never had to appear. Never had to appear. So you know, that's why we wanted you to have a lawyer. Now obviously, if you talk to them and that satisfies them, and you don't have to go back, fine. No

hitch and everybody would be happy. Right? But I don't think that's gonna happen. I, I think, they're gonna, you know, they're not gonna be satisfied with what you tell, and they're gonna think you know more. You don't.

Conversation of October 14, 1974. Transcript p. 12.

\* \* \* \* \* \*

SLAWIK: The Federal Government can't give immunity for, for, the State of Delaware. There's no God damn way. There's still State's rights. They can only give you immunity for their own government. Now the next Attorney General is going to be Dick Weir, a Democrat. Right? Maybe we can cover a lot of that stuff. But State generally, the State generally gets, from the Feds, their reports. Right? So that, say they pick up something that's not covered by Federal, might be covered by State. You're, you're running into double jeopardy. That's why the fucking fifth, you know, ah, ah, is the safe thing to do. But ah, you can do what you want. I'm not telling you what ta  . . I just want ya to understand what's involved in this. On income taxes, they can't give you immunity for income tax evasion. I don't think or at least they'd come at you civilly. *Id.* at 19.

\* \* \* \* \* \*

SLAWIK: You know, and, ah, so, the whole thing is, there's no easy way out of this God damn thing. I've been been fucking around with this damn thing for two years. There's no easy way. It's got to run it's course. I

The transcript of the tape of the October 14, 1974 meeting is 65 pages long. In the course of the conversation, Austin did tell Slawik he did not want to go back to Delaware, and Slawik did tell Austin that he would have to return to Delaware whether he liked it or not, and that he should not go before the grand jury without a lawyer. He told Austin it might be advisable to resort to a claim of the fifth amendment privilege against self-incrimination, and also told him he would arrange to get him a lawyer. It cannot fairly be said that there was any specific reference to *independent* legal counsel, nor did Slawik tell Austin to testify truthfully and waive his fifth amendment privilege.

> mean you can't run and hide from the God damn thing. Barbara thinks, you know, you talk to them, it's gonna go away.
> *Id.* at 20.
>
> \* \* \* \* \* \*
>
> AUSTIN: . . . but I don't want to go back to Delaware. Don't you understand?
> SLAWIK: But ah, I get . . . But you know, I just want ah . . .
> AUSTIN: . . . And the only way I can stay down here without going back to Delaware, ah, what they tell me is by talking to them, and then they leave, and leave me alone.
> SLAWIK: But that's not true, Bardy.
> MARIO: But whatever you say, you got ta come up and testify about . . .
> *Id.* at 23.
>
> \* \* \* \* \* \*
>
> AUSTIN: . . . I want live down here. Like I said, all I know is . . .
> SLAWIK: But you can't, but you can't escape the objective. That's all, that's all I'm trying to get through your head . . .
> MARIO: Bardy, why don't you just come back up and take the fucking fifth and forget it. Can't you do that for us? Jesus Christ, fuck this immunity shit. Just take the fucking fifth.
> *Id.* at 30.
> SLAWIK: Yeah, you know, but, but, you know, if, they haven't missed, they haven't missed a fuckin person, Bardy. In fact, it amazes me that it took so long for them to get to you. Because I told you they'd, they would. See everybody knew we were associated. Everybody knew you and Mario were associated. *Right? I figured it was inevita*ble, that they had to come and get you. They don't have nothin on you. Even that thing that they're talking about, you know. So what. But by the same token, if you're called before the Federal Grand Jury, I mean, you know, you don't want to go up there without a lawyer. Because, you know, just

But Slawik was never asked, before the grand jury, whether he advised Austin to assert the privilege against self-incrimination, nor was he asked if he suggested independent legal counsel.[13] Instead, he was asked no question at all, and simply responded to the prosecutor's paraphrase—a paraphrase which would trap an unwary, assenting witness in perjury. The paraphrase was "So you went there and said you got a subpoena. You got to testify." Slawik "explained" by enlarging:

> "Look Barney [sic] you will probably only be there a day. Get yourself legal counsel, *tell them the truth.* They are not going to hold you. You can go back to Florida." (emphasis supplied).

> suppose now for a minute, that some builder said well Bardy said to me, you know, you kept (unintelligible) you know. You don't know, what somebody else will say. So you need, you need to have the fullest legal protection for yourself. Now I want; you don't know what to say. But I'm pretty well sure that nobody, said anything about you, other than, you know, you were around, and ah, and ah, Bardy was always there, you know, that kind of shit, you know. But, I know what everybody's said.
> *Id.* at 34.
>
> \* \* \* \* \* \*
>
> SLAWIK: See they're searching from the word go, Bardy, that doesn't mean you're . . . I'm not so much worried about, what really happened. I'm worried about what they might try to pin. I know what they, you know. They've been very determined about that. Now, ah, again just another reminder. *You don't have to turn in your personal records.* You can take the fifth.
> *Id.* at 37.
>
> \* \* \* \* \* \*
>
> SLAWIK: *That's fair.* Ok. *In that case, I have* nothing to say. And then, that, then. Then you call me Tuesday night. Right? Wednesday morning I'll have a lawyer . . . Well you, you. Did Danny give you the number, that, that guy?
> *Id.* at 48.

13. It is evident from Count 8 of the indictment, see note 9, *supra* that Slawik disclosed to the grand jury that Rappa, an alleged co-conspirator, arranged for Austin to have legal representation. In light of this disclosure, we can hardly agree that Slawik's "get yourself legal counsel" remark, ambiguous at worst, was a material misstatement capable of impeding or diverting the grand jury from its investigation.

It is the government's position that the italicized language was understood by the grand jury to mean "tell the grand jury the truth." But in the context of the sentence in which the words were used they could just as well have meant "tell legal counsel the truth." Neither the indictment nor the bill of particulars sets forth the grand jury's understanding of these words. The government contends that an exculpatory construction is barred by the examiner's second paraphrase:

> So, basically your trip down there revolved around a discussion with him to convince him to come up here and testify, get it over with, *and be truthful.* (Emphasis supplied).

Aside from the fact that even the paraphrase is ambiguous, it is clear that Slawik did not accept it as his own. He replied:

> Get the damn thing over with and nobody is going to hold you, nobody is going to do anything.

He did not accept the paraphrase, if it was intended to mean "testify truthfully before the grand jury."

The ambiguity is critical. For Slawik's reply to have been a violation of § 1623, it must have been both false and material. If literally true, there was no offense, even if Slawik's answer was deliberately misleading. *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

And a false answer, if immaterial was similarly inoffensive under federal law. Nothing in the record before us gives any indication *what* the jury thought was false: we cannot say whether the trial jury found that Slawik had failed actually to advise Austin: (1) to tell *counsel* the truth, or (2) to tell *the grand jury* the truth. And nothing in the indictment or the bill of particulars tells us which construction the grand jury placed on its charge.[14]

Thus, the trial jury might have found either of two possible falsehoods, only one of which was material, in Slawik's grand jury testimony. Although materiality is a question of law over which we exercise plenary review,[15] the imprecision of the allegations contained in the indictment and bill of particulars renders meaningful review of materiality impossible. Our decision is not based on a slavish acceptance of appellant's construction of his statements. Indeed, this would be an easy case if the meaning of Slawik's statement was clear. Rather, we hold that a conviction under 18 U.S.C. § 1623 may not stand where the indictment fails to set forth the precise falsehood alleged and the factual basis of its falsity with sufficient clarity to permit a jury to determine its verity and to allow meaningful judicial review of the materiality of those falsehoods. To hold otherwise would permit the trial jury to inject its

---

14. Although Slawik argues on appeal that his statement that he told Austin to "tell them the truth" was literally true, it is plain from the transcripts that he did not say so *in haec verba.* In light of Slawik's many other statements to Austin tending to urge "stonewalling," the jury may well have decided to take a narrow view of several statements, also in the transcripts, urging Austin not to lie. We do not, therefore, disturb the jury's finding that Slawik never urged Austin to tell "them"—whoever "them" referred to—the truth.

But we must address appellee's contention, raised in its brief, that under *United States v. Chapin,* 169 U.S.App.D.C. 303, 515 F.2d 1274, *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975), and *United States v. Long,* 534 F.2d 1097 (3d Cir. 1976), the ambiguity of Slawik's statement is unavailing as a ground for reversal. *Chapin* stands for the proposition that a witness's understanding of a question propounded to him while under oath is an issue

of fact for the jury. Thus, it permits the jury to find that the defendant understood a question such that his answer to it was perjurious. *Long* indicates that the *Chapin* rule has been adopted by this court. But our holding is consistent with *Chapin* and *Long.*

Slawik was not responding to a direct question, when he made his "tell them the truth" response. There was no ambiguity of the type addressed by *Chapin* or *Long* simply because there was no question requiring construction. And the government's follow-up question, an inculpatory paraphrase, was rejected by Slawik, and cannot be imputed to him. As noted above, we do not cavil with the finding of falsity. But *Chapin* and *Long* both address the jury's power of construction with respect to the fact of truth or falsity, and not with respect to materiality, a legal question.

15. See note 8, *supra.*

inferences into the grand jury's indictment, and would allow defendants to be convicted for immaterial falsehoods or for "intent to mislead" or "perjury by implication"— which *Bronston* specifically prohibited.

We emphasize that the government knew, in this case, the precise content of each of Slawik's statements to Austin. It was free, in its evident determination to trap appellant in perjury, to ask more pointed questions. And it was free, in its indictment and its bill of particulars to set forth with crystal clarity its allegations of falsehood and materiality. This court cannot and will not affirm a criminal conviction on so nebulous a legal and factual matrix. The district court denied Slawik's motion to dismiss the indictment on Count 7.[16] The motion should have been granted.

We are reinforced in our determination that the conviction on Count 7 may not stand by the holding of the Supreme Court in *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) that if the prosecutor never asks the critical question and never presses for an unequivocal answer the defendant may not be convicted of false swearing. In the words of Chief Justice Burger:

> Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it. . . . It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the. lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination.
>
> It is no answer to say that here the jury found that petitioner intended to mislead his examiner. A jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner; the state of mind of the witness is relevant only to the extent that it bears on whether "he does not believe [his answer] to be true." To hold otherwise would be to inject a new and confusing element into the adversary testimonial system we know. Witnesses would be unsure of the extent of their responsibility for the misunderstandings and inadequacies of examiners, and might well fear having that responsibility tested by a jury under the vague rubric of "intent to mislead" or "perjury by implication."

409 U.S. at 358–59, 93 S.Ct. at 600.

What the Chief Justice said in the context of an adversarial proceeding, in which lawyers for other interested parties participated and might have eliminated the ambiguities, applies *a fortiori* to uncounseled appearances before a grand jury. Indeed the grand jury context adds a new element of speculation to the petit jury's role if, as in this case, it is permitted to resolve not only the ambiguity of the interrogator's question and the defendant's response, but also the ambiguity of the grand jury's understanding of both question and response. *See United States v. Razzaia*, 370 F.Supp. 577, 579 (D.Conn.1973). Especially where, as here, the interrogator had the clear option of resorting to references to a transcription of the October 14, 1974 conversation in order to insist upon precision, no sound public policy is advanced by a conviction for false swearing under Count 7. The false swearing statute is a potent prosecutorial tool, allowing convictions on a significantly lower standard of proof than the perjury statute, 18 U.S.C. § 1621. But Congress in its wisdom chose not to eliminate the requirements that an indictment be based only on a knowingly false, material misstatement. It would be judicial legislation of the most pernicious order to read those requirements out of the statute. At best the petit jury, on the evidence present-

16. 408 F.Supp. 190, 204–209 (D.Del.1975).

ed, was allowed to convict for "intent to mislead" or for "perjury by implication." Such a verdict may not stand, and the judgment of conviction on Count 7 must be set aside, for indictment insufficiency and failure of proof of an offense under 18 U.S.C. § 1623.

*Count 8*

The testimony set forth in Count 8 is quoted in the margin.[17] Count 8, like Count 7, was narrowed by the bill of particulars. As with the answers claimed to be false in Count 7, these answers must be read in the context of the examiner's interrogation. Although in defending the sufficiency of Count 7 the government urged that Slawik conveyed the misleading impression that he was advising Austin to obtain independent counsel,[18] the interrogation quoted in Count 8 commences with the question, "Did you contact a lawyer down there" and the answer that ". . . the lawyer that was contacted was Arthur Inden and the suggestion came from Danny Rappa. I think Inden is Rappa's lawyer."

Q: So then you must have discussed Austin's situation with Rappa?

A: Yes.

Q: Anybody else?

A: Well I might have mentioned it to Pete Ross, you know. I mention everything to him. I think I even talked to Tom Luce about it because of the relevance of the Plumco situation.

Immediately following the answer about speaking to Pete Ross and Tom Luce came the series of questions to which the answers are claimed to be materially false. The government, in order to establish their materiality and falsity reconstructs them in this manner:

Q: What did Rappa have to do with this? [the fact the FBI was interrogating Austin]

A: Nothing, only in so far as suggesting a lawyer his lawyer.

Q: How did *it* [the fact the FBI was interrogating Austin] come up, just in *casual conversation*?

A: Yes.

Q: Was he [Daniel Rappa] involved in *this thing* [the fact that the FBI was interrogating Austin]?

A: Directly, no.

Q: So you just mentioned *it* [the fact that the FBI was interrogating Austin] to him [Daniel Rappa] *casually*?

A: Yes.

Government brief p. 26 (emphasis in original).

By inserting the bracketed matter the government insists that the answers were understood to be in response to questions in the expanded form, and that those answers conveyed the false impression that Rappa's only involvement in the conversations between Slawik and Austin was to suggest an attorney. But the prosecutor knew, from the tapes, the precise extent of Rappa's participation in conversations with Austin. It never pressed the point by asking a more direct question.

We have the same difficulty with the attempted reconstruction of Count 8 as with Count 7. The initial question in the series referred to obtaining counsel for Austin. So did the next one. The third question, referred ambiguously to "Austin's situation." The answer respecting conversations with Ross and Luce refer to "it," and the question about Danny Rappa asks what he had to do with "this." The government would have us assume that the grand jury understood the reference to "Austin's situation," to "it" and to "this" to be a reference, not to Austin's need for a lawyer—the subject matter of the initial interrogation—but to Rappa's interest in the broader subject of the FBI interrogation of Austin. It urges that the reconstruction is the only reasonable interpretation of the questions posed. We cannot so hold.

Our disposition of the appeal from Slawik's Count 8 conviction requires a con-

17. See note 9, *supra.*

18. *Id.*

struction of the rule of *Chapin* and *Long*, *supra*. Although inapposite to Count 7, they present a close question here, where Slawik's statements were plainly material and were offered in response to questions by the government. We begin by accepting the government's position that *Bronston*, *supra*, does not hold ambiguous questioning to be a safe conduct for perjury. *Bronston* involved *literally true* but misleading answers. *See United States v. Corr*, 543 F.2d 1042, 1048, 1049 (2d Cir. 1976). *Long* and *Chapin* address the question that necessarily arises when an answer would be true on one construction of an arguably ambiguous question but false on another: who decides which construction the defendant placed on the question? The solution offered by *Long* and *Chapin*, and by which we are bound, is that the petit jury decides.

■ But even as we eschew a broad reading of *Bronston*, so we decline to apply *Long* and *Chapin* in an overbroad fashion. *Chapin* involved an "answer [that] was knowingly false under the only reasonable interpretation of the question . . . ." 515 F.2d at 1283. *Long* involved alleged ambiguity in the terms "bribes," "kickbacks" and "payoffs," terms which we held "are not terms of art, they are words of common currency which form part of the vocabulary of almost any American in his teens or older." 534 F.2d at 1100. But the questions asked to Slawik were not nearly as clear. In reversing the trial court's dismissal of the indictment in *Long*, we said that a charge of perjury may not be dismissed "when it is entirely reasonable to expect a defendant to have understood the terms used in the questions." *Id.* at 1101. In this case, defendant unsuccessfully moved the court for dismissal of the indictment on Count 8. We hold that this count, premised as it is on questions that were deliberately artless and vague, should have been dismissed, for it was entirely unreasonable to expect that the defendant understood the questions posed to him.

Given the narrow scope of review of jury verdicts under *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), this count should never have gone to a jury. *Glasser* and *Long* have the capacity for totally insulating convictions under 18 U.S.C. § 1623 from judicial review, and thus totally eviscerating *Bronston's* clear warning against the use of imprecise questioning as a predicate for a perjury conviction. The conviction on Count 8 must be reversed for the insufficiency of the indictment.

### Count 9

■ The testimony set forth in Count 9 is quoted in the margin.[19] Like the others, it, too, was narrowed by the bill of particulars. From a colloquy extending for eighteen questions, the government extracted two answers which were allegedly false ". . . as it relates to his knowledge of the financing of a house purchased by Bayard Austin and any benefits derived from Bayard Austin." The other sixteen questions and answers revealed to the grand jury: that in May of 1974, Mario Capano and Slawik were anxious to have Austin remain a resident of Florida; that Austin's wife preferred to return to Delaware; that Austin located a house in Florida, and needed help in financing it; that Capano took steps to obtain a loan for Austin secured by a mortgage; that Slawik was aware that Capano helped Austin secure a mortgage; that one purpose of an April 1974 trip to Florida was for Slawik to find out what system was involved in obtaining the loan, "how much the house cost, this kind of stuff"; that the acknowledged purpose was so that Austin would not come back to Delaware; but that Slawik did not *give* Austin any money.

It is the government's position that answers No. 15 and 18 [20] were knowingly false in that they were unequivocal denials of knowledge of Capano's participation in the arrangement to make a "hush money" loan to Austin, and that the answers, so construed, had the natural effect or tendency to influence, impede or dissuade the grand

**19.** See note 9, *supra*.

**20.** *Id.*

jury from pursuing its investigation of obstruction of justice or subornation of perjury. The ultimate issue, then is materiality. We must decide whether, after Slawik *admitted* that he was interested in keeping Austin from returning to Delaware, that he went to Florida "to find out what system was involved, how much the house cost, this kind of stuff," and that Capano was helping finance the house purchase, his unresponsive answers to questions No. 15 and 18 were such as to impede or dissuade the grand jury from its investigation. We hold that in the context of the overall line of questioning, these answers, even if not literally true, could not have had such an effect.

It is not a federal offense to help a friend or business associate finance a new house. If Slawik's allegedly false statements merely concealed such innocent aid, they could not possibly have been material. The real question before the grand jury was whether Slawik obstructed or conspired to obstruct justice, by buying Austin's silence. Slawik's admissions were nearly enough to indict him. He admitted numerous overt acts of aid for and involvement with Austin. He did not concede a motivation of obstructing justice. If Slawik had obtained financing for Austin and had denied it before the grand jury, that denial might have been a material misstatement. But in light of his admissions concerning his own conduct, we do not see how Slawik's failure to volunteer the details of Capano's financial arrangement with Austin could have had any material effect on the grand jury's investigation. Slawik did not conceal that there was a financial arrangement. We simply do not think it material whether Capano held a first mortgage or a second mortgage, or which banks, if any, were involved. Such information would be surplusage of the most trivial order, wholly beside the point of the investigation.

Moreover, the prosecuting attorney, having full knowledge from the tape recordings of Capano's participation and Slawik's awareness of that participation, made no effort to ask a more specific question, or to demand a more responsive answer. Since the materiality of the question is a matter for the Court, and we have concluded that the equivocations in questions 15 and 18 were not material, we need not consider Slawik's further contention that the answers, even though equivocal, were literally true. The conviction on Count 9 must also be set aside.

█ It is appropriate to add that the case illustrates the danger inherent in the use by government prosecutors of Title IV of the Organized Crime Control Act of 1970, P.L. 91–452. That title reduces the standard of proof required for a conviction for perjury under 18 U.S.C. § 1621. But as the legislative history makes clear, knowledge, falsity and materiality are distinct elements of the offense which must still be proved by the prosecution. *See* House Report No. 91–1549, 91st Cong. 2d Sess., 1970 U.S.Code Cong. and Admin.News, p. 4023. If two contradictory material declarations are made under oath before a court or grand jury within the period of the statute of limitations, it may suffice that an indictment recite merely the materiality of each and their irreconcilability. 18 U.S.C. § 1623(c). But a tape recording of extra-judicial conversations does not serve the same purpose. In cases where the government is relying upon extra-judicial prior inconsistent statements to establish falsity, proof of mere inconsistency is not enough. The grand jury must charge specifically what it believes are the true facts. Moreover if the courts are to discharge their obligation of determining materiality they should be informed in the indictment in what manner the falsity alleged affected the grand jury's deliberations. Finally, without attempting to lay down any standard of prosecutorial conduct before the grand jury for all cases, we think it fair to say that if transcriptions of electronic interceptions are to be the basis for false swearing prosecutions we will insist that the government's interrogation be far more precise than in this case.

The judgment appealed from will be reversed.