**UNITED STATES of America**

v.

**Robert B. CLARKE.**

**No. 78–157(S)–Cr–J–M.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Feb. 5, 1979.

John J. Daley, Jr., U. S. Atty., by Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for the government.

Albert J. Datz, Jacksonville, Fla., for defendant.

## ORDER

MELTON, District Judge.

This cause is before the Court on the defendant's motion to dismiss the superseding indictment, which accuses the defendant of perjury under 18 U.S.C. § 1623 (1976). Essentially, it is the defendant's position that the indictment's allegations of materiality and falsity are fatally defective, requiring dismissal.

The alleged perjury arises out of the defendant's trial testimony in a criminal case against a former associate, Dr. John Van Horn Philpot, in *United States v. Philpot,* No. 78-35(S)-Cr-J-C (M.D.Fla., filed June 20, 1978). During the time period framed by the *Philpot* information, Clarke was employed as a physician's assistant and worked closely with Dr. Philpot. The *Philpot* information charged that on thirty-four separate occasions Dr. Philpot had unlawfully caused the dispensation of a controlled substance in that he had [e. g., Count One] "caused one Robert B. Clarke . . . to prescribe said controlled substance by furnishing Clarke with a prescription form which he, [Dr. Philpot], had signed, but written no prescription on, with instructions that Clarke utilize same, at Clarke's discretion, for the prescribing of a controlled substance . . . ." Thus, the substance of the *Philpot* allegations was that Dr. Philpot had given Clarke blank, pre-signed prescription forms and had vested in Clarke the discretion to prescribe controlled substances over Philpot's signature. Each prescription allegedly issued by Clarke under this procedure was listed in a separate count of the *Philpot* information, for a total of thirty-four counts.

The indictment in the instant case (copy appended) alleges that it was material for the *Philpot* tribunal "to determine whether or not Robert B. Clarke, while working as a physician's assistant for John Van Horn Philpot, M.D., ever prescribed Schedule II controlled substances without obtaining specific approval in advance from John Van

Horn Philpot, M.D., for the issuance of each particular prescription in the indictment." The indictment then goes on to recite, for approximately four pages, Clarke's allegedly perjurious testimony in the *Philpot* trial. Since this case, in its present posture, is before the Court on a motion to dismiss the indictment, the Court is of course assuming the truth of the government's allegations.

■ Principally relying on the line of cases that begins with *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), the defendant argues that the materiality and falsity allegations of the instant indictment are insufficient as a matter of law. In the Court's view, the defendant's reliance on *Bronston* and its progeny is misplaced, or is at least premature at this stage. *Bronston* stands for the general proposition that the federal perjury statute, 18 U.S.C. § 1621 (1976), will not support a perjury conviction if the evidence shows that a defendant's sworn response to interrogation, albeit highly misleading, is literally truthful. Cases subsequent to *Bronston* have imputed this principle to the perjury statute that Clarke allegedly violated. *See, e. g., United States v. Abrams,* 568 F.2d 411, 422 n.54 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

■ The chief defect in the defendant's argument is that *Bronston* and its progeny deal with the sufficiency of evidence actually adduced at trial in support of the government's allegations. For the purposes of the sufficiency of an *indictment,* the government need not allege in detail the facts relied upon to support its allegations; the government need only allege the essential elements of the crime charged in such a manner that the accused may prepare his defense and invoke the double jeopardy clause in any subsequent prosecution for the same offense. *E. g., United States v. Crippen,* 579 F.2d 340, 342 (5th Cir. 1978), *petition for cert. filed,* —— U.S. ——, 99 S.Ct. 837, 59 L.Ed.2d 34 (1978). To the extent that a case heavily relied upon by the defendant, *United States v.*

*Slawik,* 548 F.2d 75 (3d Cir. 1977), may impose upon the government a greater duty to allege the precise falsehood of the defendant's statements and the factual predicate for its allegations, that case has been specifically rejected by this circuit. *Crippen,* 579 F.2d at 342.

■ The Court is not unaware of the fact that the testimony recited in the instant indictment is hardly a paradigm of the precise questioning and specific response called for by *Bronston.* Whatever problems that may cause the government when it seeks to prove its allegations are beside the point at this stage. In essence, when the defendant argues that the indictment's materiality allegations are insufficient, he must argue that the quoted testimony *could not have been,* as a matter of law, material to the Philpot trial. This is not apparent to the Court from the face of the indictment, as it would have to be in order to justify a dismissal. The standard of materiality is itself a broad one; "essentially anything that could influence or mislead the trial court or the jury is considered to be material." *United States v. Whimpy,* 531 F.2d 768 (5th Cir. 1976). To take an example relied upon by the defendant, the indictment alleges (on page three) that the following exchange took place between the *Philpot* prosecutor and the defendant Clarke:

Q: And then the person can just leave with the prescription and there is in fact no consultation with him?

A: There is always a consultation. I never fill out a prescription that has a class 2 drug at my own discretion. Dr. Philpot authorizes it.

The defendant argues that this testimony at most encompassed the general practice between Dr. Philpot and the defendant, and that the prosecutor's failure to pin the defendant to a particular instance renders this testimony immaterial. That is not necessarily the case. Fed.R.Ev. 406 specifically authorizes the use of "habit" or "routine practice" evidence as relevant to prove that a person acted in conformity therewith on a particular occasion. The Court would hasten to add that it is not presently ruling on the materiality of this testimony; that will be a question to be decided by the Court based upon the record developed at trial. The Court merely cites this example by way of illustrating its analysis of the defendant's arguments.

■ In sum, then, the Court concludes that this indictment is at least sufficient to withstand a motion to dismiss. Other defense objections to the indictment, alluded to in the memorandum supporting the defendant's motion to dismiss, may be subject to review upon the appropriate motion, *e. g.* a motion for a bill of particulars or a Fed.R.Crim.P. 7(d) motion to strike surplusage.

For the foregoing reasons, it is hereby ADJUDGED:

That the defendant's motion to dismiss the superseding indictment in this cause is denied.

APPENDIX

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

ROBERT B. CLARKE

No. 78–157(S)–Cr–J–M

*INDICTMENT*

The Grand Jury charges:

*COUNT ONE*

On or about June 29, 1978, at Jacksonville, in the Middle Judicial District of Florida,

### ROBERT B. CLARKE

while under oath as a witness in a criminal case entitled *United States v. John Van Horn Philpot, M.D.,* No. 78–35(S)–Cr–J–C, knowingly and wilfully did make a false material declaration, that is to say:

1. At the time and place aforesaid the court and jury were engaged in the trial of the aforementioned case wherein John Van Horn Philpot, M.D., the defendant, was charged with causing the said Robert B. Clarke, a person not authorized to dispense controlled substances, to prescribe Schedule II controlled substances by furnishing Clarke with prescription forms which he, John Van Horn Philpot, M.D., had signed, but written no prescription on, with instructions that Clarke utilize same, at Clarke's discretion, for the prescribing of a controlled substance.

2. It was a matter material to said trial to determine whether or not Robert B. Clarke, while working as a physician's assistant for John Van Horn Philpot, M.D., ever prescribed Schedule II controlled substances without obtaining specific approval in advance from John Van Horn Philpot, M.D., for the issuance of each particular prescription for each patient.

3. At the aforesaid time and place, Robert B. Clarke, while under oath, did knowingly make the following declarations concerning said material matter to the court and jury:

\*　　\*　　\*　　\*　　\*　　\*

"Q Whenever you have filled out a written prescription form for Dr. Philpot's patient, has that always been at his direction and supervision?

A Yes, sir.

Q And that would hold true for all controlled 2 substances that you have filled out the body of the prescription for?

A That would hold true for all controlled 2 substances that I fill out the body of a prescription form for any physician that I have ever worked for.

Q And that would include Dr. Philpot?

A That includes Dr. Philpot.

Q Were those his specific directions to you?

A Yes, sir.

Q All right. Now, in regards to other medications—for instance—

THE COURT: Mr. Clarke, in your own words, what were his directions to you in that regard?

THE WITNESS: Whatever it may be. To write a prescription for any one of these medications, class 2 medications. He would either give me a direct order or I'd ask him.

I'd say, 'Dr. Philpot, so-and-so needs some Preludin.'

And he would say, 'Okay.'

BY MR. BOOTH:

Q In other words, Mr. Clarke, is it fair to say that he either told you to do it or you suggested it to him and he approved it before you wrote it in?

A He approved of all class 2 drugs."

\*　　\*　　\*　　\*　　\*　　\*

"Q So, in fact, you make the notation on the chart and write the medication on the prescription forms?

A Something to that effect.

Q And then the person can just leave with the prescription and there is in fact no consultation with him?

A There is always a consultation. I never fill out a prescription that has a class 2 drug at my own discretion. Dr. Philpot authorizes it.

Q He authorizes it by giving you a blank presigned form?

A No, sir.

Q Mr. Clarke, again, your interpretation of the phrase 'direction' is when Dr. Philpot directs you to see a patient and do what is appropriate? Is that your construction of the phrase? That means anything you deem appropriate?

A Well, it wouldn't be appropriate to give him a class 2 drug prescription without Dr. Philpot's okay.

Q Okay. After the substance is determined?

A Well, without his authorizing that it be done so that he knows that particular prescription with the class 2 drug on it is going to that particular person, who will to [*sic*] to a pharmacy and fill it.

Q In fact, you acknowledge it would be wrong for you to determine what the substance was without Dr. Philpot's approving it subsequently before the prescription was filled?

A It would be wrong for me to think such a thing?

Q No, no.

A For me to do such a thing?

Q That's what I'm asking you.

A Yes.

Q Are you acknowledging that would be wrong?

A Well, that what would be wrong? You're getting down to a lot of points—

Q That it would be wrong for you to issue a Schedule 2 prescription.

A Without Dr. Philpot's knowledge, yes.

Q Without his approving it after you wrote the substance on there?

A Yes.

Q Well then, Mr. Clarke, that being the case, what could possibly be the purpose of your having presigned prescription forms?

MR. BOOTH: I object, Your Honor.

That's repetitious. He has asked the question—

THE COURT: I'm going to let him ask him one more time.

A We're working in the clinic. He's coming in and out of the doors, and I am, too. We're talking on the telephone dictating and talking to people who have questions about things on the floor.

We have charts that we hold. We have prescription pads that we have. We have pens we hold and the telephones. We may—and often we are trying to deal with all of these things at the same time.

If Dr. Philpot would sign a script, two or three at a time, hand them to me as we're working in the office whenever he didn't have all of these things going on, and then I could say or communicate with him one way or the other that, 'Clarence Dupree has need for Tuinal.' And he would say okay. Then he wouldn't have to put down his phone, put down his chart, put down his prescription pad, and put down his pen and then sign it at that particular time.

Q Well now, are you saying you had a personal communication with him every time?

A That's what I'm saying.

Q Didn't you earlier testify that you very rarely went to see him about this?

A I very rarely—rarely what? One time a day, which would be five days—five times a week or a time a month—I don't remember. I don't know.

But the general procedure was for Dr. Philpot to hand me some that had already, that already had his signature on it. The part that I rarely do is fill it out blank. But I did do it. There were times I did it and then go to him and have him sign it.

Q Or go to him and talk with him about it?

A No. I went and talked to him or on the intercom, some way communicated with Dr. Philpot the purpose, you know, the need for a class 2 drug. That's the way it has to be done. That is the way it is done."

\* \* \* \* \* \*

4. The aforesaid testimony of Robert B. Clarke, as Clarke then and there well knew, was false, in that he, Clarke, had prescribed Schedule II controlled substances while working as a physician's assistant for John Van Horn Philpot, M.D., without obtaining specific approval in advance for the particular prescription;

all in violation of Title 18 United States Code, Section 1623.