**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert DeZARN, Defendant–Appellant.**

No. 97–5156.

United States Court of Appeals,
Sixth Circuit.

Argued June 11, 1998.

Decided Oct. 14, 1998.

Kenneth R. Taylor (argued and briefed), Asst. U.S. Attorney, Lexington, KY, for Appellee.

John K. West (argued and briefed), R. Burl McCoy (briefed), McCoy, Baker & West, Lexington, KY, for Appellant.

Before: NELSON and RYAN, Circuit Judges; ROSEN, District Judge.[*]

## OPINION

ROSEN, District Judge.

This appeal calls upon us to clarify the law of this Circuit as to whether a person may be found guilty of perjury where he gives sworn testimony which, from the context of the questioning and circumstances surrounding the investigation, can reasonably be inferred to be knowingly untruthful and intentionally misleading, even though the specific question to which the response is given may itself be imprecise.

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

■ Because we believe that the crime of perjury depends not only upon the clarity of the questioning itself, but also upon the knowledge and reasonable understanding of the testifier as to what is meant by the questioning, we hold that a defendant may be found guilty of perjury if a jury could find beyond a reasonable doubt from the evidence presented that the defendant knew what the question meant and gave knowingly untruthful and materially misleading answers in response. Accordingly, for the reasons more fully developed below, we affirm the Defendant's conviction and sentence in this case.

## I. *FACTUAL BACKGROUND*

In the spring of 1990, a group of active and retired officers of the Kentucky National Guard, including Defendant Robert DeZarn, Billy Wellman, John Julian, and Ed Gill, met at Billy Wellman's home to discuss raising funds for Brereton Jones' gubernatorial campaign. At that meeting, they selected officers from a list of active officers in the guard from whom funds were to be solicited by designated members of the group. The funds were to be collected at a "Preakness Party" being held at Wellman's home on May 19, 1990.

As indicated, the "Preakness Party" was held in May 1990. Invitations were sent out, inviting guests to "a Preakness Party ... for an evening of fun on the farm". Sixty guests attended and gubernatorial candidate Jones made a short speech. Contributions to Jones' campaign were collected at that event. DeZarn admitted in his trial testimony that he received contributions to Jones' campaign at that party. Other witnesses testified to giving contributions to DeZarn at that party, to seeing DeZarn, Wellman and others counting checks at the party, and to discussing with DeZarn the sources of cash contributions at the party.

A year later, in June of 1991, Wellman held another party which DeZarn also attended. This was a small dinner party, attended only by six people: Wellman and his wife, DeZarn and his wife, and another couple. They had dinner, watched the Belmont Stakes horse race on television, and then went to a horse show afterwards. No active guardsmen attended, nor were campaign contributions made or collected. Governor Jones neither attended nor was invited to that party.

After Jones was elected governor in November 1991, he appointed DeZarn Adjutant General of the Kentucky National Guard. The Adjutant General is the chief commanding officer of the Kentucky National Guard. In 1992, DeZarn convened a Selective Retention Board. Every few years, a Selective Retention Board, consisting of three officers, is picked by the Adjutant General of the Guard. This board is designed to review the military records of officers eligible for retirement and determine which officers will be retained beyond that point, and which of them have reached their "maximum potential" and should be let go or, in Guard parlance, "non-retained."

Normally, the Board removes only a small number of officers. However, in 1992, an unusually large number of officers were "non-retained," several of whom complained to the Inspector General of the Army, alleging that they were let go because they did not support Jones' gubernatorial campaign. Among other things, these officers alleged that individuals who attended the Preakness Party at Wellman's and made a campaign contribution were not released.

In response to those allegations, the Inspector General sent two army officers, Colonel Thomas Mulrine and Colonel Robert Tripp, to investigate the allegations. The investigators conducted interviews of about 30 witnesses. Prior to conducting the interviews, each interviewee was contacted by phone and apprised of the investigation and its subject matter. Every witness interviewed was asked about the Preakness Party and the Selective Retention Board. The investigators did not know about the pre-party planning meeting nor did any of the individuals interviewed provide them with any information concerning that meeting.

One of the witnesses interviewed during the investigation was Defendant Robert DeZarn. In pertinent part, the interview, which was conducted by Colonel Tripp under oath pursuant to 10 U.S.C. § 936(b), was as follows:

Q: Okay, sir. My question is going to deal with General Wellman, though.

Was it traditional for General Wellman to hold parties at his home and invite Guardsman to attend?

A [by DeZarn]: Well, I suppose you could say that for a number of years that going back to the late 50s he has done this on occasion.

Q: Okay. In 1991, and I recognize this is in the period that you were retired, he held the Preakness Party at his home. Were you aware of that?

A: Yes.

Q: Did you attend?

A: Yes.

\* \* \* \* \* \*

Q: Okay. Sir, was that a political fundraising activity?

A: *Absolutely not.*

Q: Okay. Did then Lieutenant Governor Jones, was he in attendance at the party?

A: I knew he was invited. I don't remember if he made an appearance or not.

Q: All right, sir. You said it was not a political fundraising activity. Were there any contributions to Governor Jones' campaign made at that activity?

A: *I don't know.*

Q: Okay. You did not see any, though?

A: *No.*

Q: And you were not aware of any?

A: *No.*

One witness interviewed by Colonels Mulrine and Tripp indicated that DeZarn received a contribution for Jones at the Preakness Party. The investigators, however, did not credit that witness' testimony because it was not substantiated and because they interpreted one of DeZarn's answers in his interview as a denying that he received contributions. Therefore, the investigators' final report indicated that they were unable to sustain the allegations of improper political influence over the Selective Retention Board, although they noted the fact that a retired colonel, Ed Gill, had been brought out of retirement to fill a slot which had been vacated by the Board "gave a perception of favoritism."

The report did reveal, however, that there was evidence that one officer, John Julian, had improperly solicited funds from fellow officers, in violation of the Hatch Act, 18 U.S.C. § 602. Following that revelation, Julian came forward with additional information about the Preakness Party. He also provided information concerning the planning meeting for that party which had not been disclosed to Colonels Mulrine and Tripp in their witness interviews which formed the basis of their initial report.

In light of the new information provided by Julian, additional investigations were subsequently conducted which revealed DeZarn's involvement in the planning meeting and his collection of contributions at the Preakness Party.

DeZarn was then charged with perjury on the basis of his sworn answers in his interview with the investigators.[1]

The indictment charged that DeZarn knew the testimony he gave the investigators—specifically, his denial of the "Preakness Party" being a fundraising activity and his denial of knowledge of campaign contributions being made at that party—was false when he gave it

in that he had helped organize an effort to solicit or request that contributions be made by National Guardsmen to the Brereton Jones campaign, to be collected at the "Preakness Party"; and at said Preakness Party, he had personally collected from National Guardsmen several cash

---

1. DeZarn was charged under 18 U.S.C. § 1621, which provides:

Whoever—
(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath

states or subscribes any material matter which he does not believe to be true....

\* \* \* \* \* \*

is guilty of perjury and shall, except as otherwise expressly provided is guilty of perjury and shall, except as otherwise expressly proved by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

and check contributions for the Jones campaign.

On March 11, 1996, DeZarn moved to dismiss the indictment against him arguing that the indictment against him was insufficient to charge him with perjury because when he was questioned by the Inspector General's investigators, he was asked about a Preakness Party at Billy Wellman's house in 1991 as opposed to 1990, and he gave literally truthful answers with respect to Wellman's 1991 dinner party. The District Court denied DeZarn's motion finding from the full context of the investigator's questioning and DeZarn's answers that DeZarn and the investigator "were on the same song sheet" with respect to the Preakness Party in question, that being the party in 1990. Therefore, the court found Defendant's "literal truth" argument inapplicable, and accordingly, found no insufficiency in the indictment. The case, therefore, proceeded to trial.

At trial, DeZarn testified that Colonel Tripp, by mistakenly setting the questions in his interview about the Preakness Party in 1991, rather than 1990, led him to answer the questions with reference to the 1991 dinner party, which was not a fundraiser and at which he did not collect any contributions.

Evidence was presented at trial, however, to establish that DeZarn was not misled by the 1991 date but had answered the investigators' questions as he had with intent to deceive them. Specifically, all of the individuals questioned by the investigators described the same party, even though some were questioned about a "Preakness Party", some were questioned about a "1990 Preakness Party", and some, like DeZarn, were questioned about a "1991 Preakness Party". Witnesses further testified that "the Preakness Party" was a singular event and was the subject of much gossip in the Guard because of its alleged connection with the Selective Retention Board. Evidence was also presented that two months before DeZarn's interview with the investigators, the party and its connection with the Selective Retention Board were the focus of a series of newspaper articles in the *Louisville Courier Journal.* In fact, DeZarn had been interviewed by reporters in connection with those articles and admitted at trial that he had read and discussed the articles with others. In one of the articles, DeZarn is quoted as saying that he attended Wellman's *1990* Preakness Party but saw no fundraising. Finally, Billy Wellman testified that he "had only one 'Preakness Party', as a Preakness party itself, in 1990," and no witness testified that there was any Preakness party in 1991.

On September 26, 1996, the jury returned a verdict of guilty. DeZarn then moved for a Judgment of Acquittal, arguing that the United States did not present sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that DeZarn's allegedly perjurious statements were false or that the statements were material statements. The District Court denied DeZarn's motion, and on January 23, 1997, DeZarn was sentenced to 15 months incarceration and fined $5,000.00.

DeZarn now appeals his conviction and sentence arguing,

(1) the indictment against him was insufficient;

(2) the statements upon which the indictment was based were literally true and, therefore, cannot serve as the basis for a charge of perjury;

(3) the Government did not present sufficient evidence at trial to sustain a finding that his allegedly false statements were material;

(4) the District Court erred in refusing to instruct the jury on the "two witness rule"; and

(5) in sentencing him, the District Court improperly assessed a two-point enhancement for obstruction of justice.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

The sufficiency of the indictment is reviewed *de novo. United States v. Holmes,* 975 F.2d 275 (6th Cir.1992). The standard for reviewing sufficiency of evidence is whether, taking the evidence in the light most favorable to the government, any rational jury could find guilt beyond a reasonable doubt. *United States v. Pena,* 982 F.2d 71 (6th Cir.1991). Failure to give a requested defense instruction is reviewed for deter-

mination of whether the instruction requested (1) is a correct statement of the law (2) is not substantially covered by another instruction and (3) is so substantial that it impairs the appellant's defense. *United States v. Williams,* 952 F.2d 1504, 1512 (6th Cir.1991). Application of the Sentencing Guidelines is reviewed for an abuse of discretion. *United States v. Smart,* 41 F.3d 263, 264 (6th Cir. 1994).

## B. *SUFFICIENCY OF THE INDICTMENT*

In arguing insufficiency of the indictment against him, DeZarn first argues that his conviction must be reversed because the indictment against him did not present a "stark contrast" between the "truth portion" and his allegedly false testimony. Since the indictment alleged that DeZarn accepted contributions at a 1990 Preakness Party and alleged that he testified falsely when he stated that he did not accept contributions at a *1991* Preakness Party, Defendant argues that under the "stark contrast" rule, the indictment was insufficient to charge him with the offense of perjury. As a corollary argument, DeZarn argues that his answers to the investigator's questions dealing with the 1991 Preakness Party were literally true and, therefore, cannot form the basis for a perjury conviction even if there was an intent to mislead or evade.

### 1. *THE "STARK CONTRAST" RULE*

The "stark contrast" rule and the "literal truth" defense both had their genesis in *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). In *Bronston,* the defendant was charged with perjury based upon the following answers he gave to questions in bankruptcy proceedings:

Q: Do you have any bank accounts in Swiss banks, Mr. Bronston?

A: No, sir.

Q: Have you ever?

A: The company had an account there for about six months, in Zurich.

409 U.S. at 354, 93 S.Ct. 595.

Although Bronston had maintained personal accounts in a Swiss bank for five years, his answers were literally true since he did not have a Swiss bank account when he was questioned and since his business did have the account he described. 409 U.S. at 354, 93 S.Ct. 595. The jury convicted and the Second Circuit affirmed, finding that "for the purposes of 18 U.S.C. § 1621, a nonresponsive answer containing half of the truth which also constitutes a lie by negative implication, when intentionally given in place of the responsive answer called for by a proper question, is perjury." 409 U.S. at 356, 93 S.Ct. 595.

The Supreme Court reversed, holding that:

[T]he perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner—so long as that witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object to [sic] the questioner's inquiry.

409 U.S. at 352, 93 S.Ct. 595, (citing *United States v. Wall,* 371 F.2d 398 (6th Cir.1967)). In reaching its determination, the Court reasoned that it saw

no reason why Congress would intend the drastic sanction of a perjury prosecution to cure a testimonial mishap that could readily have been reached with a single additional question by counsel alert—as every examiner ought to be—to the incongruity of petitioner's unresponsive answer.

409 U.S. at 358, 93 S.Ct. 595.

The *Bronston* Court's decision, however, was premised upon the fact that the defendant had given a nonresponsive answer to the question asked, which the interviewer merely took to imply a negative answer to the question. Specifically, in phrasing the questions, the examiner phrased the initial question in the present tense: "Do you have any bank accounts in Swiss banks?" The response, "No, sir," was literally true, since at the time he was asked the question, Bronston did not have any Swiss bank accounts. The next question asked Bronston, "Have you ever?", to which Bronston gave a partially truthful but incomplete and misleading answer, that *his business* had had a Swiss bank account for about six months.

Taken in the context of the questioning, this response was really nonresponsive. The

Court pointed out that "An unresponsive answer is unique ... because its unresponsiveness by definition prevents it from being tested in the context of the question—unless there is speculation as to what the unresponsive answer 'implies'." 409 U.S. at 355 n. 3, 93 S.Ct. 595. Thus, because a nonresponsive answer, by its nature, requires speculation by the fact-finder as to what the answer "implies", there cannot be a finding beyond a reasonable doubt that the answer is untruthful.

■ Where, however, the answer given is responsive to the question asked and "it is entirely reasonable to expect a defendant to have understood the terms used in the question," a charge of perjury may not be dismissed for insufficiency. *United States v. Slawik*, 548 F.2d 75, 86 (3d. Cir.1977). *See also, United States v. Lane*, 735 F.2d 799 (5th Cir.1984) (as long as there is an unambiguous understanding of the meaning of the question, with no possibility that the questioner and answerer were talking about different events, the issue of whether or not the answer is false is for the jury). Thus, the question and answer must be examined in the context of the investigation as a whole and the state of the defendant's knowledge in order to determine whether ambiguity exists. *United States v. Calimano*, 576 F.2d 637 (5th Cir.1978). *See also, United States v. Schulman*, 817 F.2d 1355, 1360 (9th Cir.1987), *cert. denied*, 498 U.S. 813, 111 S.Ct. 51, 112 L.Ed.2d 27 (1990) (examining context to determine ambiguity of testimony).

■ What is presented in this case is not a nonresponsive, or only partially responsive, answer. Rather, we have a series of categorical answers to questions with a partially mistaken premise or presupposition. In a case very similar to the one now before the court, the Eighth Circuit used factual context to resolve the ambiguity in testimony with a false presupposition, and refused to extend *Bronston* to allow the defendant "to escape a false oath charge by misleading the questioner with false testimony and then supply literally true answers to questions based on his false testimony." *United States v. Robbins*, 997 F.2d 390, 395 (8th Cir.1993), *cert. denied*, 510 U.S. 948, 114 S.Ct. 391, 126 L.Ed.2d 340 (1993). Robbins testified as follows in a bankruptcy proceeding:

Q: Sir, what is 11th and Meridian? Is that a financial institution?

A [by Robbins]: No, Huh-uh.

Q: What is it?

A: That was a little corporation that was formed to buy a motel at 11th and—excuse me, I got to back up. Did you say 11th and Meridian?

Q: Yes.

A: I do not know what that 11th and Meridian is. There is a company called 11th and MacArthur.

Q: Okay. And that is a corporation that was formed when?

A: Oh, last couple of years.

* * * * * *

Q: Is the corporation still in existence?

A: Yes, sir. Didn't buy the property it was going to buy.

Q: Does it have any assets?

A: No.

997 F.2d at 394.

Neither 11th and Meridian, nor 11th and MacArthur, existed; however, Robbins was the president of a company called MacArthur and 11th Properties, Inc., which did have some assets. 997 F.2d at 394. Using the defendant's testimony about the existence and characteristics of the corporation, the Eighth Circuit held that, in the context of the question and answer, there was no ambiguity and the testifier clearly knew what was being asked. Therefore, the court concluded that a jury could find that the testimony was actually about a real corporation with those characteristics. 997 F.2d at 395. "Absent fundamental ambiguity or impreciseness in the questioning, the meaning and truthfulness of the declarant's answer is for the jury." 997 F.2d at 395.

DeZarn attempts to distinguish *Robbins*, claiming that in *Robbins*, it was "the defendant and not the interrogator who injected the 'Eleventh and MacArthur' corporation into the questioning." However, that fact played no role in the court's analysis, and the court gave no indication that its decision would have been any different had Robbins given the same false testimony about the nonexistent corporation "11th and Meridian"

which the questioner introduced as he gave about the nonexistent corporation "11th and MacArthur" which the defendant introduced. The crucial point was that the defendant's testimony regarding the existence and characteristics of "11th and MacArthur" eliminated any "fundamental ambiguity" and made it a jury question as to whether the defendant's statements were actually about the real corporation with those characteristics, MacArthur and 11th Properties. 997 F.2d at 395.

As the District Court noted in denying DeZarn's pre-trial motion to dismiss the indictment, this case is almost factually and contextually identical to *Robbins*. Both Robbins and DeZarn answered questions about the existence and characteristics of a literally non-existent entity ("11th and MacArthur" and a "1991 Preakness Party") in a way that uniquely identified a real entity ("MacArthur and 11th Properties" and the "1990 Preakness Party").

■ The question presented here, then, is whether in a perjury case in which a mistaken premise exists in one of the questions asked of the testifier, the Government is entitled to present, and the jury to consider, evidence of the context of the questioning which would establish that the Defendant— despite the false premise of the question— knew exactly what the questions meant and exactly what they were referring to. We hold that the law of perjury not only permits this, but in cases such as this, requires it.

First, perjury must be shown to be willful, and it must be shown that the testifier did not believe his responses to be true. 18 U.S.C. § 1621. Thus, by its very nature, perjury requires an inquiry into the Defendant's state of mind and his intent to deceive at the time the testimony was given. Indeed, the entire focus of a perjury inquiry centers upon what the testifier knew and when he knew it because in order to make a determination as to whether that person intended to testify falsely, it must be established beyond a reasonable doubt that he knew his testimony to be false when he gave it. In order to prove this, the Government, of necessity, must present evidence of the extent of a Defendant's knowledge of the subject matter of the questioning and the circumstances surrounding how he came to that knowledge. This, of course, requires

the Government to show the full context of the Defendant's activities as well as other information of which he may have had knowledge and which may have influenced him.

Thus, a perjury inquiry which focuses only upon the precision of the question and ignores what the Defendant knew about the subject matter of the question at the time it was asked, misses the very point of perjury: that is, the Defendant's intent to testify falsely and, thereby, mislead his interrogators. Such a limited inquiry would not only undermine the perjury laws, it would undermine the rule of law as a whole, as truthseeking is the critical component which allows us to determine if the laws are being followed, and it is only through the requirement that a witness testify truthfully that a determination may be made as to whether the laws are being followed. Indeed, that is the entire purpose of the sworn oath: To impress upon the testifier the need—under penalty of punishment—to testify truthfully.

This is not to say that the question to which the answer is made is not an important part of a perjury inquiry. Of course it is. A question that is truly ambiguous or which affirmatively misleads the testifier can never provide a basis for a finding of perjury, as it could never be said that one intended to answer such a question untruthfully. But, where it can be shown from the context of the question and the state of the testifier's knowledge at the time that the testifier clearly knew what the question meant, the Government must be permitted to present, and the fact-finder to consider, those contextual facts.

The circumstances presented here are just such a case. The context of the investigation in this case establishes that it would be "entirely [ ]reasonable to expect that DeZarn understood that the questions posed to him" concerned the 1990 party. *Slawik, supra,* 548 F.2d at 86. Even if the questioning was not perfectly precise, the context in which the questions were asked made the object of the questioning clear and, more importantly, it is clear that DeZarn knew exactly the party to which Colonel Tripp was referring. The evidence at trial clearly established that Billy Wellman held only one Preakness Party

and that was in 1990. No Preakness Party was held in 1991. Furthermore, the characteristics of the 1990 and 1991 parties differed markedly. More than 60 persons were invited to the 1990 Preakness Party, including then Lieutenant Governor Jones who was running for governor. In contrast, only three couples—Billy Wellman and his wife, DeZarn and his wife, and one other couple—attended Wellman's 1991 dinner party. Lieutenant Governor Jones did not attend that gathering, nor was he invited.

With respect to DeZarn's argument that he believed Colonel Tripp's questioning referred to the 1991 party, there was ample evidence to show that it is quite implausible that DeZarn would not remember, as he testified he did not, whether the future governor of the Commonwealth attended or did not attend a dinner party with only six people present.

Perhaps most tellingly, however, the evidence at trial showed that Colonel Tripp's investigation and questioning of DeZarn did not occur in a vacuum of information or news. First, several witnesses testified that the "Preakness Party" was a singular event that was the subject of a great deal of gossip within the Guard because of its ties to the decisions made by the Selective Retention Board. But, the Preakness Party was not only the subject of gossip—it was, two months before DeZarn's testimony, the subject of a series of newspaper articles in the *Louisville Courier Journal*, articles which DeZarn was interviewed for and which he admitted he had read and discussed with others. Indeed, DeZarn was quoted in one of the articles as saying that he attended the *1990* Preakness Party and that, just as he falsely testified to Colonel Tripp, he did not see any fundraising at that party.

Given this factual background, there was certainly abundant evidence from which a jury could find beyond a reasonable doubt that DeZarn knew at the time he answered Tripp's questions exactly which party Tripp was referring to in his questions.

Finally, and perhaps most revealing, the transcript of Colonel Tripp's continued questioning of DeZarn immediately following the questions which formed the basis of the indictment makes clear that DeZarn could not have been thinking of the 1991 six-couple dinner party when he gave his answers to the inspector:

> Q: Let me just ask you, did attendance at that activity [the Preakness Party] have any bearing on who you may have removed from the [non-retained] list?
>
> A: No, because I didn't know who was invited, and who wasn't.

DeZarn's statement here makes absolutely no sense if, as he claims, he was thinking about an intimate, three-couple dinner party where he knew everyone very well. Further, none of those people were subject to the Selective Retention Board and he certainly knew everyone who was invited. By contrast, the 1990 Preakness Party was always known by that name. Invitations were mailed out using that name. Over sixty people attended, and then Lieutenant Governor Jones came and spoke. Importantly, a number of the invitees were subject to the upcoming Selective Retention Board.

Accordingly, we find that it was not improper to send to the jury the question whether DeZarn "willfully and contrary to [his] oath state[d] or subscribe[d] any material matter which he [did] not believe to be true" in violation of 18 U.S.C. § 1621. To dismiss this indictment for lack of "stark contrast" would be to apply that rule beyond its rationale and thereby allow the Defendant to "escape a [perjury] charge by misleading the questioner with false testimony and supply literally true answers to questions based on his false testimony." *Robbins, supra*, 997 F.2d at 395.[2]

Therefore, we conclude that the District Court did not err in denying DeZarn's motion to dismiss the indictment against him for

---

**2.** In this case, unlike any case where the "stark contrast" rule has been applied, a material portion of the Defendant's testimony is false under every possible construction of the testimony. If DeZarn's testimony is construed to be about the 1990 Preakness Party at Wellman's, DeZarn's testimony regarding contributions to Governor Jones' campaign at that party is false. If the testimony is construed to be about a non-existent 1991 Preakness Party at Wellman's, DeZarn falsely stated that Governor Jones was invited and may have attended.

lack of "stark contrast." The context of the investigation makes clear that DeZarn had an unambiguous understanding that the Army investigator's questions were directed at the 1990 Preakness Party and the District Court was correct in permitting the jury to consider evidence showing the context of Defendant's knowledge of the subject matter of the questions.

## 2. THE "LITERAL TRUTH" DEFENSE

DeZarn also argues that his conviction should be reversed because the testimony upon which his indictment was predicated was literally true with respect to Wellman's 1991 dinner party. We agree with the District Court's determination that the literal truth defense is inapplicable in this case.

■ As indicated above, the Bronston "literal truth" defense applies in cases where a perjury defendant responds to a question with an unresponsive answer. As noted, "[a]n unresponsive answer is unique ... because its unresponsiveness ... prevents it from being tested in the context of the question—unless there is speculation as to what the unresponsive answer 'implies'." Bronston, supra, 409 U.S. at 355 n. 3, 93 S.Ct. 595. See also United States v. Wall, 371 F.2d 398 (6th Cir.1967), (a defendant cannot be convicted of perjury if his answer is literally true on one reasonable interpretation of the question asked when there is no evidence supporting one construction over the other). This Court's reversal of the defendant's conviction in Wall was predicated upon the fact that "there was no evidence to show what the question meant to Mrs. Wall when she answered it. In the absence of such evidence, no determination could be made as to the falsity of her answer." 371 F.2d at 400.

■ By contrast, in this case, Defendant DeZarn gave unequivocal and directly and fully responsive answers to the questions asked by the Army investigator. Furthermore, as discussed above, there is more than ample context and evidence to test the meaning and falsity of DeZarn's answers.

Moreover, as the Eighth Circuit observed in Robbins supra, when the questions and answers proceed on a false premise of which the defendant is aware, he may not evade the true intent of the line of questioning by stacking literally true answers on top of the false premise. 997 F.2d at 395.

For all of the foregoing reasons, we find no error on the part of the District Court in finding the "literal truth" defense inapplicable to the line of questioning at issue here.

## C. SUFFICIENCY OF EVIDENCE AT TRIAL

DeZarn also argues that his conviction should be reversed because the Government did not present sufficient evidence at trial to sustain a finding that his allegedly false statements were material. Defendant contends that materiality requires a showing that the false testimony was the precise factor in the outcome of the proceedings in which the falsity was uttered. The basis for this argument is that although other witnesses had told the investigators that contributions had been made at the Preakness party, the investigators' final report still concluded that the allegations of political influence over the Selective Retention Board were unfounded and no evidence was produced that a different result would have been reached if DeZarn's answers would have been different.

■ This argument is as misleading as the Defendant's testimony itself. First, the Defendant's legal premise is seriously flawed. Contrary to Defendant's assertions, the test for materiality of a false statement does not require a showing that the outcome of the proceedings in which the statement was uttered would have been different had the defendant answered truthfully. A false statement can be material even if ultimately the conclusion of the tribunal would have been the same. United States v. Chandler, 752 F.2d 1148 (6th Cir.1985). To be material, all that must be shown is that the perjurious answer "had the potential or natural tendency to affect or influence the [investigator] in, or impede or dissuade [him] from, pursuing [the] investigation." United States v. Gribben, 984 F.2d 47, 51 (2d Cir.1993) (emphasis added). See also, Callanan v. United States, 881 F.2d 229 (6th Cir.1989), cert. denied, 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990) (materiality is defined

as "having any tendency to influence" an investigation).

■■■■ Because the standard for materiality is a legal standard, we review the trial court's instruction on materiality de novo. *Jones v. Federated Financial Reserve Corp.,* 144 F.3d 961, 966 (6th Cir.1998). If the instruction is correct, the "verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Warner,* 971 F.2d 1189, 1195 (6th Cir.1992)(quoting *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

Here, Instruction No. 11 stated: "False testimony is 'material' if the testimony has the natural effect or tendency to influence the Inspector General of the Army on the issues before it." If anything, this instruction held the Government to a more stringent standard than necessary. Therefore, we review the record to determine whether there is substantial evidence in the record to support the jury's verdict. We find that Defendant's argument has no support.

■■■ Colonel Tripp testified that truthful statements by General DeZarn would have led to further questions, exposing the pre-Preakness Party planning meeting and the quantity of contributions, which, in turn, would have expanded the focus of the investigation. It could have further led to a finding that the Selective Retention Board was tainted by the appearance of partiality, in violation of army regulations.

Defendant's contention that substantially the same evidence that truthful answers by General DeZarn would provide were given to the investigators by other witnesses is simply wrong. While it is true that one witness did say that he gave money to DeZarn at the Preakness Party, this witness' testimony is of virtually no weight compared to what the state of the evidence would have been had DeZarn himself testified truthfully because (1) it was DeZarn himself who was one of the prime movers behind the Preakness Party fundraising—DeZarn helped plan the Preakness Party and was the "bag man" for numerous contributions; and (2) it was DeZarn who was the primary focus of the investigation since he was the head of the Guard and

had personally appointed the members of the Selective Retention Board which had made the retention decisions under scrutiny.

In sum, the uncontroverted testimony of Colonel Tripp regarding how different answers by DeZarn would have influenced his investigation provides substantial evidence on which the jury's verdict can be sustained.

## D. *TWO WITNESS RULE*

■■■ DeZarn argues that the trial court committed reversible error by refusing to instruct the jury on the "two witness rule." According to the two witness rule, proof of the falsity of the defendant's testimony cannot be established beyond a reasonable doubt by the uncorroborated testimony of a single witness. *Weiler v. United States,* 323 U.S. 606, 607, 65 S.Ct. 548, 89 L.Ed. 495 (1945); *Spaeth v. United States,* 218 F.2d 361, 363 (6th Cir.1955). The two witness rule prevents convictions from resting on "an oath against an oath" for fear that "innocent witnesses might be unduly harassed or convicted in perjury prosecutions if a less stringent rule were adopted." *Weiler,* 323 U.S. at 609, 65 S.Ct. 548.

Since *Weiler,* Congress has enacted a new statute covering specifically perjury before a grand jury or court, 18 U.S.C. § 1623(e), which contains an express rejection of the two witness rule in perjury actions under this new section. ("Proof beyond a reasonable doubt under this section is sufficient for conviction. *It shall not be necessary that such proof be made by any particular number of witnesses* or by documentary or other type of evidence."). In light of the fact that Congress chose to limit the rejection of the two witness rule to prosecutions to perjury occurring before grand juries or a court, even the United States does not contest the general validity of the two witness rule, nor the defendant's entitlement to an instruction on the rule when it is applicable.

However, the Government argues that this case is one in which an instruction on the two witness rule is not required and urges this court to follow the Seventh Circuit's determination in *United States v. Nicoletti,* 310 F.2d 359 (1962), *cert. denied,* 372 U.S. 942, 83 S.Ct. 935, 9 L.Ed.2d 968 (1963), that it was

not error to refuse to instruct the jury on the two witness rule when the sole issue is the defendant's state of mind when he made the statement since that rule is not applicable under such circumstances. 310 F.2d at 362–63.

In *Nicoletti*, the defendant had testified that he did not remember having been previously interviewed by the FBI in 1959 and the proof in the case solely concerned his memory, which could only be proven by circumstantial evidence. 310 F.2d at 362. Noting that there are two essential elements of proof in a perjury prosecution—(1) that the statements made by the defendant be proven false and (2) that the defendant did not believe those statements to be true when he made them—the court held that where the falsity of the statements is capable of proof by direct testimony, and the only issue was whether the defendant believed the statements to be false when he made them, the two witness rule is inapplicable. 310 F.2d at 362.

Although this Court has not ruled on whether an explicit instruction on the two witness rule is necessary under such circumstances, this court has previously held that the two witness rule is inapplicable when the only issue at trial relates to the state of mind of the accused. *See United States v. Swainson,* 548 F.2d 657, 662 (6th Cir.1977), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *see also Behrle v. United States,* 100 F.2d 714, 715–716 (D.C.Cir. 1938); *United States v. Beach,* 296 F.2d 153, 155 (4th Cir.1961); *United States v. Collins,* 272 F.2d 650, 652 (2d Cir.1959); *Fotie v. United States,* 137 F.2d 831, 842 (8th Cir. 1943).

In *Swainson*, the defendant first testified before the grand jury that he "had no recollection" of two telephone conversations with his co-defendant in which his co-defendant proposed a scheme to exonerate a co-conspirator in a bribery case. Two days later, he told the grand jury that the conversations had taken place. Independent corroborative evidence was presented at trial which supported the subsequent admission. The only real issue at trial was whether Swainson truly had no recollection of the telephone conversations when he so testified before the grand jury.

The jury ultimately convicted. On appeal, Swainson argued that the Government did not satisfy the "two witness rule". This Court held that when the perjury issue relates to the state of mind of the accused,

> proof of perjury must necessarily consist of proof of facts from which the jury may infer that the defendant must have known or remembered that which he denied knowing or remembering while under oath. Permitting perjury to be proven in this manner does not depart from the "spirit" of the two witness rule. **The jury could properly infer from all the evidence that the appellant willfully failed to answer the questions concerning these conversations truthfully at his first appearance.**

548 F.2d at 662 (emphasis added).

 We find that this case falls squarely within the *Nicoletti/Swainson* exception since DeZarn admitted in his trial testimony that he took contributions at the 1990 Preakness Party, thereby removing from controversy the question of whether his testimony was false and leaving only the issue of whether his testimony to Colonel Tripp was intentionally false, or only inadvertently false, due to a misunderstanding of the question caused by a false presupposition. Since the jury could only determine the meaning of DeZarn's testimony from circumstantial evidence (the context of that testimony, the characteristics of the two parties which he claims to have confused, etc.), under *Swainson* the two witness rule is inapplicable to the jury's determination of the meaning of DeZarn's testimony. Even DeZarn does not suggest that the two witness rule is applicable in this case, only that an instruction on it is an absolute entitlement of a perjury defendant.

 Since there can be no error in refusing to instruct on a rule which has no application, we reject Defendant's argument and adopt the Seventh Circuit's decision in *Nicoletti.* Therefore, we hold that a district court need not instruct on the two witness rule when the sole issue is the defendant's state of mind.

### E. *SENTENCE ENHANCEMENT*

DeZarn's final argument is that the trial court improperly applied a two-point adjustment for obstruction of justice when sentencing him. The enhancement was applied pursuant to U.S.S.G § 3C1.1 (Obstructing or Impeding the Administration of Justice).[3] Application Note 6 to that guideline states that this enhancement is not be applied in perjury cases "except where a significant further obstruction occurred during the investigation, prosecution, or sentencing." U.S.S.G. § 3C1.1 n.6. DeZarn argues that the enhancement was improper since his testimony at trial was a "mere reiteration of the allegedly perjurious testimony which he gave during the Inspector General's investigation."

This court reviews for abuse of discretion a sentencing court's determination of whether a defendant's actions constitute an obstruction of justice punishable under the guidelines. *United States v. Smart,* 41 F.3d 263, 264 (6th Cir.1994).

The district court adopted the findings of the Presentence Investigation Report (PSI) as the basis for the enhancement. The PSI identified four false statements by De-Zarn at trial, two of which misrepresented the nature of the meeting to plan the Preakness Party, one of which was an implausible explanation of his denial to the newspapers that he saw no fundraising at the 1990 Preakness Party, and one of which was his explanation that his testimony to the investigators was not false because he was led to think of the 1991 dinner party instead of the 1990 Preakness Party. DeZarn does not challenge the finding that these statements were false, only that they constituted "significant further obstruction."

Contrary to DeZarn's claim, these statements are not mere reiteration of his testimony to the investigators since none of them were made to those investigators. Given the trial court's better view of the proceedings, the fact that DeZarn does not argue that these statements had no bearing on the trial, and the fact that DeZarn based a defense on his explanation of his testimony to the inves-

tigators, this court cannot say that the trial court abused its discretion in applying the two-point enhancement for obstruction of justice. We, therefore, affirm the enhancement.

### CONCLUSION

For all of the foregoing reasons, we AFFIRM Defendant DeZarn's conviction and sentence.

---

**3.** U.S.S.G. 3C1.1 provides:

 If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.