*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

FAWAZ MOHAMMED DAMRAH, a/k/a FAWAZ
DAMRA,

        *Defendant-Appellant.*

No. 04-4216

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00484—James Gwin, District Judge.

Argued: February 1, 2005

Decided and Filed: March 15, 2005[*]

Before: NORRIS and GIBBONS, Circuit Judges; TODD, District Judge.[**]

_____

**COUNSEL**

_____

**ARGUED:** S. Michael Lear, ZUKERMAN, DAIKER & LEAR, Cleveland, Ohio, for Appellant. Arnold C. Celnicker, DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** S. Michael Lear, ZUKERMAN, DAIKER & LEAR, Cleveland, Ohio, for Appellant. Arnold C. Celnicker, DEPARTMENT OF JUSTICE, Washington, D.C., James V. Moroney, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. Jeffrey M. Gamso, AMERICAN CIVIL LIBERTIES UNION OF OHIO, Cleveland, Ohio, for Amicus Curiae.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge. Fawaz Mohammed Damrah was found guilty of unlawfully obtaining citizenship in violation of 18 U.S.C. § 1425 by making false statements in a citizenship application and interview. Damrah was sentenced to two months of incarceration, four

---

[*] This decision was originally issued as an "unpublished decision" filed on March 15, 2005. On May 6, 2005, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable James D. Todd, Chief United States District Judge for the Western District of Tennessee, sitting by designation.

months of home confinement with electronic monitoring, and three years of supervised release. The district court also ordered Damrah's citizenship revoked pursuant to 8 U.S.C. § 1451(e). Damrah now appeals, asking this court to overturn his conviction.

## I.

Fawaz Mohammed Damrah, a/k/a Fawaz Damra, entered the United States on a visa in 1984. Approximately two years later he became the Imam, or religious leader, of the Al-Farooq Mosque in Brooklyn, New York. Damrah left New York City in 1990 and moved to Cleveland, Ohio, where he became the Imam of the Islamic Center of Cleveland, the position he held at the time of his June 2004 trial. Damrah filed an application for naturalization on October 18, 1993. A naturalization interview was conducted on December 17, 1993, and he was naturalized on April 24, 1994.

Damrah was involved in establishing the New York office of Afghan Refugee Services, Inc., ("ARS") an organization created to support fighters in Afghanistan attempting to expel the Russians in the late 1980's. Specifically, Damrah approached the Board of Directors of the Al-Farooq Mosque and obtained approval to open an ARS office within the Mosque. Additionally, Damrah was an initial director of ARS and traveled around the United States with the leader of ARS raising money for the organization. Damrah's 1990 departure from the Al-Farooq Mosque resulted from a dispute over the use of contributions to ARS after the Soviets were expelled from Afghanistan in February 1989.

Damrah was also involved with the Palestinian Islamic Jihad ("PIJ") and the Islamic Committee for Palestine ("ICP"). The PIJ opposes the existence of the State of Israel and is committed to eliminating it. Terrorist attacks orchestrated by the PIJ have resulted in its designation as a Specially Designated Global Terrorist Organization by the United States Department of State and its inclusion, since 1989, as a major terrorist group in the Department of State publication, Patterns of Global Terrorism. The ICP was used to raise funds for the PIJ in the United States. Damrah's own characterization of the ICP, captured on video at a fund-raising event, is instructive: "A brief note about the Islamic Committee for Palestine: It is the active arm of the Islamic Jihad Movement in Palestine. We preferred to call it the 'Islamic Committee for Palestine' for security reasons."[1] Videotapes containing footage showing Damrah speaking at fund raisers for the ICP and PIJ were seized in 1995 during a search of the home and offices of Sami Al-Arian, the president of the ICP.

Damrah submitted his application for naturalization, INS Form N-400, to the Cleveland Immigration and Naturalization Service ("INS") office on October 18, 1993. Question 3, Part 7 asked: "Have you at any time, anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion?" Damrah answered no. Part 9 of Form N-400, captioned "Memberships and organizations," instructed the applicant to:

> List your present and past memberships in or affiliation with every organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place. Include any military service in this part. If none, write "none." Include the name of the organization, locations, dates of membership and the nature of the organization.

Damrah listed only the "Islamic Council of Ohio" and the "Islamic Center of Cleveland" in response to this question; he did not list ARS, the PIJ, or the ICP. Damrah signed Part 11 of Form N-400,

---

[1] Damrah made this statement at a fund-raising event in 1991 when introducing Sami Al-Arian, the president of the ICP.

which requires that the applicant "swear or affirm, under penalty of perjury under the laws of the United States of America, that this application, and the evidence submitted with it, is all true and correct."

Kim Adams, an INS examiner, interviewed Damrah on December 17, 1993. The interview was a naturalization requirement and was intended to permit the INS to make a determination about Damrah's qualifications for naturalization. Adams had the authority to deny the application based on information provided in the interview. Adams reviewed each of Damrah's answers on the INS Form N-400, noting any changes Damrah wished to make. Adams testified that a "yes" response to the persecution question "could render [the applicant] ineligible for naturalization." A dishonest answer to the persecution question would permit the INS to deny the application, as could providing information about organizations that might have been involved in persecution. Adams also testified that if an applicant reported a membership or affiliation with a suspect organization in response to Part 9 of Form N-400, she would elicit more information, request documentation, or "forward the application over to the investigative section for further inquiry." Intentionally providing false answers on Part 9 of the form could result in a denial of the application. Damrah signed the form, under penalty of perjury, at the conclusion of the interview. Damrah was granted naturalization on April 29, 1994. The omissions from Damrah's naturalization application were discovered in 1995 when videotapes were seized from Al-Arian's home and offices.

On December 16, 2003, a single count indictment was returned in the United States District Court for the Northern District of Ohio charging Damrah with unlawful procurement of naturalization in violation of 18 U.S.C. § 1425(a) and (b). Specifically, Damrah was charged with (1) knowingly procuring naturalization contrary to law and to which he was not entitled by failing to disclose membership in or affiliation with ARS, the PIJ, and the ICP; (2) falsely stating that he had never ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion; and (3) failing to disclose that he had been arrested and charged with assault in January of 1989 in New York City.

On April 26, 2004, the United States filed a Notice of Intent to Use Foreign Intelligence Surveillance Act ("FISA") Information pursuant to 50 U.S.C. 1801 *et seq.* The intended evidence included audio tapes of phone conversations and two faxes. On the same day, Damrah filed a motion to suppress the evidence obtained from FISA surveillance of Al-Arian as well as a motion to compel production of FISA applications, orders, and related documents. The trial court denied both of Damrah's motions on June 9, 2004. A jury trial began on June 15, 2004. At the conclusion of the government's case, the district court granted Damrah's motion to dismiss the portion of the indictment regarding Damrah's arrest in 1989. The jury returned a guilty verdict on June 17, 2004. On September 20, Damrah was committed to the Bureau of Prisons for two months, followed by four months home confinement with electronic monitoring and three years of supervised release. On September 23, 2004, the district court ordered Damrah's citizenship revoked pursuant to 8 U.S.C. § 1451(e). Damrah filed a timely notice of appeal.

## II.

### A.

The indictment in this case was a one-count indictment charging Damrah with violating 18 U.S.C. § 1425(a) and (b). Damrah argues that the indictment was duplicitous because § 1425(a) and (b) are separate offenses, rather than different means of committing the same offense, and as such must be charged in separate counts in an indictment. *See* Fed. R. Crim. P. 8(a); *United States v. Campbell*, 279 F.3d 392, 398 (6th Cir. 2002) (holding that a count charging two or more offenses is impermissibly duplicitous). Damrah further argues that the indictment was duplicitous because 18 U.S.C. §§ 1001 (making a false statement in a matter within the jurisdiction of the federal

government) and 1015(a) (making a false statement relating to naturalization) were predicate offenses to the charged violation of § 1425. The crux of Damrah's argument is that the jury was instructed to consider four different statutes with different elements under a one-count indictment. Damrah asserts that this violated his rights to due process, jury unanimity, and to be informed of the nature of the accusations against him as guaranteed by the Fifth and Sixth Amendments.

Whether an indictment is duplicitous is a legal question that is reviewed *de novo*. *Campbell*, 279 F.3d at 398. "In determining whether there is duplicity or multiplicity [in an indictment] the decisive criteria are legislative intent and separate proof." *United States v. Duncan*, 850 F.2d 1104, 1108 n.4 (6th Cir. 1988). Rather than defining two crimes, § 1425(a) and (b) provide two means by which unlawful naturalization can be obtained. Under the statute, one can procure naturalization "contrary to law" (§ 1425(a)) or naturalization to which one is not entitled (§ 1425(b)). It is not duplicitous to allege in one count that multiple means have been used to commit a single offense. Fed. R. Crim. P. 7(c)(1). The distinction between means and elements is illustrated by *Schad v. Arizona*, 501 U.S. 624 (1991), and *Richardson v. United States*, 526 U.S. 813 (1999). As the government points out:

> In *Schad*, the Supreme Court considered a one-count indictment for first-degree murder. The statute defined first-degree murder as "murder which is . . . premeditated . . . or which is committed . . . in the perpetration of . . . robbery." *Schad*, 501 U.S. at 628. The Court held that "premeditation" and "in the perpetration of . . . robbery" were not *elements* of the crime; they were *means* of satisfying the *mens rea element*. . . . *Schad* went on to hold that it was not necessary for the jury to be unanimous as to whether Schad had engaged in premeditated murder or felony murder, as they are not elements of the crime. *See also Richardson*, 526 U.S. at 817 ("Calling a particular kind of fact an 'element' carries certain legal consequences. . . . [A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element.").

The district court, assuming duplicity without deciding the issue, concluded that any possible harm to Damrah would be cured by a special unanimity instruction and a special jury form. *See United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir. 1981) ("The rules about multiplicity and duplicity are pleading rules, the violation of which is not fatal to an indictment."). The court did deliver a special unanimity instruction explaining § 1425 and the predicate offenses, 18 U.S.C. §§ 1001, 1015(a).[2] The district also prepared and presented to the parties a special verdict form which the defense counsel declined "in light of the unanimity instruction." The district court also noted that, even if parts (a) and (b) constitute different crimes, Damrah was well aware he was being charged under both. Therefore, even if the indictment was duplicitous, it was harmless. *See United States v. Kimberlin*, 781 F.2d 1247, 1250-51 (7th Cir. 1985) (noting that duplicity is harmless in a case where none of the concerns raised by duplicity exist); *United States v. Alsobrook*, 620 F.2d 139, 142 (6th Cir. 1980) ("Ultimately, the indictment must be measured in terms of whether it exposes the defendant to any of the inherent dangers of a duplicitous indictment.").

While we do not believe that the indictment was duplicitous, we also agree with the district court that any duplicity was harmless. We affirm the district court's denial of Damrah's motion to dismiss the indictment as duplicitous and find no error in the jury instructions.

---

[2] The jury instructions initially proposed by the district court defined the elements of § 1425 without differentiating between (a) and (b). At the charging conference, the parties and the court agreed that the instructions would be clearer if there was "more of a separation between 1425(a) and (b)." The instructions given to the jury recited the three elements of the crime using the language from part (a) – "contrary to law" – and then recited the elements using the language in part (b) – "not entitled to."

**B.**

Damrah filed motions to compel the production of FISA applications, orders, and related documents and to suppress FISA obtained evidence. The district court denied the motions, and during the trial the government admitted audio tape recordings obtained as a result of FISA surveillance of Al-Arian under 50 U.S.C. §§ 1806(a), (e), and (g).[3] The relevant statute provides that a defendant challenging a FISA application may be permitted to review the application and order when disclosure is "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f). The statute also provides that if the Attorney General files an affidavit stating that "disclosure or an adversary hearing would harm the national security of the United States" the court must consider the application and order in camera to determine if the surveillance was lawful. *Id.* An affidavit was filed by the Attorney General in this case, and Damrah's motions to compel and suppress were denied without an adversarial hearing. Damrah does not argue that the district court failed to follow the statutorily prescribed procedures applicable when a district court reviews the "legality of the [FISA] surveillance." *See id.* Instead, he asserts that the procedures themselves violated his constitutional rights.

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Foster*, 376 F.3d 577, 583 (6th Cir. 2004) (quoting *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000)). However, an abuse of discretion standard is used when reviewing a district court's refusal to disclose the substance of affidavits and certifications that accompanied applications for surveillance under FISA, and there is no abuse of discretion absent a showing of misrepresentation of the facts or any other presentation warranting disclosure. *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984). The result is the same regardless of the standard used.

Damrah relies on *Mathews v. Eldridge*, 424 U.S. 319 (1976), to argue that the Due Process Clause required an evidentiary hearing on this issue. Damrah's reliance on *Mathews* is misplaced, however, because FISA's requirement that the district court conduct an ex parte, in camera review of FISA materials does not deprive a defendant of due process. *See United States v. Ott*, 827 F.2d 473, 476 (9th Cir. 1987). There is likewise no merit to Damrah's argument that *Alderman v. United States*, 394 U.S. 165 (1969), mandates that surveillance materials and an adversarial hearing be conducted before a district court can determine whether the surveillance was authorized and lawfully conducted. In *Alderman*, the issue was whether surveillance materials should be produced and an adversarial hearing conducted where the prosecution planned to use evidence from surveillance that had already been deemed unlawful. *Id.* at 182-83.

Damrah also asserts that *Franks v. Delaware*, 438 U.S. 154 (1978), governs the case. *Franks* held that a search warrant is subject to attack if it is based on an affidavit containing material false statements (and/or omissions), knowingly and intentionally made, or made with a reckless disregard for the truth. *Id.* at 155-56; *see United States v. Atkin*, 107 F.3d 1213, 1216 (6th Cir. 1997). Damrah argues that erroneous statements and material omissions are difficult to detect without adversarial proceedings. *Franks* does not apply to a challenge of the underlying procedures themselves, but rather to the attempt to sidestep the underlying procedures. Even assuming that *Franks* applies to FISA applications and orders, Damrah's *Franks* attack was non-specific and unsupported. Thus, Damrah failed to meet his threshold burden under *Franks*. 438 U.S. at 155-56.

---

[3]Damrah asserts that the FISA obtained evidence included "several audio tape telephone intercepts and video tapes." The video tapes referred to were seized pursuant to a search of Al-Arian's home and offices in 1995 and were not FISA-obtained evidence. Rather, the FISA obtained evidence included excerpts from six telephone conversations and two facsimile transmissions.

Finally, Damrah suggests that the procedures dictated by FISA violate the Fourth Amendment. This argument also lacks merit, as FISA has uniformly been held to be consistent with the Fourth Amendment. *E.g., In re Sealed Case*, 310 F.3d 717, 742-47 (F.I.S.C.R. 2002); *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987); *United States v. Cavanagh*, 807 F.2d 787, 790-92 (9th Cir. 1987); *Duggan*, 743 F.2d at 73 n.5. For the foregoing reasons, we affirm the district court's denial of Damrah's motions to compel FISA materials and suppress FISA evidence.

### C.

Damrah objected to expert testimony from the government's witness Matthew Levitt. Damrah sought an order excluding Levitt's testimony, or, in the alternative, a hearing to determine the admissibility of Levitt's proposed testimony under Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). After conducting a hearing, the district court denied Damrah's motion. Damrah's primary objection to Levitt's testimony was that it relied heavily on inadmissible hearsay in violation of Federal Rule of Evidence 703[4] and that Levitt's testimony did not satisfy the requirements of Federal Rule of Evidence 702, which dictates that an expert may offer an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." A district court's evidentiary rulings will not be reversed absent a clear showing of abuse of discretion. *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990).

Damrah's arguments are without merit. Levitt did not present any inadmissible hearsay to the jury, and the materials he relied on met the requirements of Rule 702. The district court stated: "Given the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon. Indeed, Damrah himself failed to suggest any." The district court also described Levitt's methodology as "the gold standard in the field of international terrorism." The district court did not abuse its discretion in allowing Levitt's testimony.

### D.

Damrah contends that the evidence presented at trial was insufficient to support his conviction for violating 18 U.S.C. § 1425(a) and (b). The standard of review for insufficient evidence claims is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Damrah argues that the evidence at trial was insufficient to prove that his statements regarding membership, affiliation, and persecution were false.

Damrah alleges that he was not a member of ARS, ICP, or PIJ because he never paid dues to any of the organizations nor was he listed on any membership list. He also asserts that the government failed to establish affiliation under the district court's definition – "a mutual understanding or recognition that the organization can rely and depend on [Appellant] to cooperate with it, and to work for its benefit, for an indefinite future period upon a fairly permanent basis." Specifically, Damrah argues that there was no evidence that he would work for the benefit of the organizations indefinitely into the future or on a fairly permanent basis. Damrah next argues that there was no evidence of incitement or assistance in the persecution of Jews, though he concedes that he "encouraged support for Palestinians engaged in resistance against the Israeli occupation of

---

[4]Damrah bases this objection on Levitt's testimony that he relied in part on certain books on the PIJ, press releases and newspaper articles, and the U.S. government publication, "Patterns of Global Terrorism." The only one of these sources revealed to the jury was "Patterns of Global Terrorism," which the court determined was "not inadmissible."

land the Palestinians consider theirs." Finally, Damrah argues that, under 18 U.S.C. § 1425(b), the government did not present sufficient evidence to establish that Damrah was not entitled to naturalization, and, under 18 U.S.C. § 1425(a), the government failed to prove that Damrah knew his statements concerning membership, affiliation, and persecution were false, thus failing to satisfy the knowledge requirement.

In addition to these arguments, Damrah asserts that the persecution and affiliation questions were fundamentally ambiguous or without meaning "about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it [was] sought and offered as testimony." *United States v. Ryan*, 828 F.2d 1010, 1015 (3d Cir. 1987) (quoting *United States v. Lighte*, 782 F.2d 367, 375 (2d Cir. 1986)). The persecution question asked, "Have you at any time, anywhere, ever ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion?" Damrah argues that the term "persecution" was ambiguous and that because the preceding question on the N-400 form asked a question about Nazis, the word "persecution" was associated with a "systematic, state-sponsored effort to oppress and eradicate a comparatively weaker group on the basis of religion, race, or some similar distinctive feature." Damrah concludes that, based on that understanding of "persecution" as it was used in the question, his answer was truthful. *See United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978) (holding that government must "negative any reasonable interpretation that would make the defendant's statement factually correct").

Damrah argues that "affiliation" was also ambiguous because the request for affiliations was separate from the requests for memberships; therefore, the two terms must have different meanings. Because of alleged "arguable ambiguity," Damrah argues that the district court erred in denying his motions for judgment of acquittal. *See United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998) (noting that when a question is arguably ambiguous, a defendant's "understanding of the question is for the jury to resolve in the first instance").

Contrary to all of Damrah's assertions, the evidence was sufficient to support the guilty verdict. First, there was a need for secrecy regarding support for the groups that Damrah was involved with; these groups did not have dues paying members or keep membership lists. Furthermore, as the government states, "the lack of membership list and dues pales in light of the evidence adduced at trial concerning the defendant's role in these organizations." Damrah's membership and leadership role in the ICP and PIJ was established by the videotape evidence in which he persuaded sympathetic individuals to donate money to those groups. His membership in the ARS was likewise established through evidence that he cooperated with, and worked for the benefit of the group and served as a founder and director. Because the jury could reasonably conclude that Damrah was a member of the organizations, it could also conclude that he was affiliated with the groups, since affiliation by definition is something less than membership. *See Killian v. United States*, 368 U.S. 231, 257-58 (1961).

Damrah's assertion that the evidence was insufficient to prove that his relationship with any of the organizations was "for an indefinite future period" or on a "fairly permanent basis" is without merit. The evidence shows that Damrah was affiliated with ICP and PIJ from 1989 until at least April 1994, the court-imposed cut off date for trial evidence because Damrah became a United States citizen that month. The evidence also shows that Damrah worked to establish the ARS in 1987 and was a founder and initial director of the group. There was enough evidence to conclude that Damrah was affiliated with all three organizations "for an indefinite future period" or on a "fairly permanent basis." Damrah's claim that evidence of persecution was insufficient also lacks merit. It is clear that Damrah engaged in fund raising activity for a terrorist organization. Therefore it was reasonable for the jury to conclude that he was inciting or assisting in conduct that led to persecution of Jews.

There is likewise no merit to Damrah's claim that the evidence was insufficient to establish that he "knowingly" gave false answers during the naturalization process. As the government points out, the videotape evidence demonstrates that Damrah was a "whole-hearted, enthusiastic, and effective leader of ICP/PIJ, who was closely aligned with other leaders and founders" as opposed to being "subtl[y] or marginal[ly]" involved. The government's brief is compelling on this point: "Indeed the jury had before it graphic evidence from which to infer his state of mind when he falsely answered questions on Form N-400, and again at the naturalization interview, regarding affiliations or memberships, and incitement or assistance in persecution." The reasonable inference is that Damrah was aware that if he answered the questions on the form truthfully he would not be entitled to citizenship. *See United States v. Moses*, 94 F.3d 182, 187 (5th Cir. 1996) ("The jury could infer from Moses's misrepresentation that he knew that the true status of his marital relationship would render him not entitled to citizenship.").

It is only in exceptional cases that a question is so ambiguous, fundamentally ambiguous, such that no answer can be false as a matter of law. If there is no fundamental ambiguity, the jury resolves any ambiguities. *United States v. DeZarn*, 157 F.3d 1042, 1048 (6th Cir. 1998) (perjury charge); *United States v. Finucan*, 708 F.2d 838, 848 (1st Cir. 1983) ("[W]here an answer may or may not be false depending upon possible interpretations of an ambiguous question, it is for the jury to decide whether the defendant has committed perjury."). Damrah confuses ambiguity with breadth. The persecution question is broad but not ambiguous. Additionally, Damrah's claim that his interview with Adams created ambiguity is disingenuous, because the N-400 form was filled out prior to the interview and the purpose of the interview is to answer any questions the applicant has about the form. Damrah's assertion that "affiliation" was ambiguous also lacks merit. He argues that "affiliation" has many different meanings. That may be true, but the affiliation question was not fundamentally ambiguous; therefore, any arguable ambiguity was left for the jury to decide. The evidence was sufficient to support Damrah's conviction and we affirm the district court.

**E.**

Damrah argues that the trial court abused its discretion by permitting the government to admit the videotapes and translated DVD's made from the videos over Damrah's objection that the videos had not been authenticated under Federal Rule of Evidence 901. A district court's evidentiary rulings will not be reversed absent a clear showing of abuse of discretion. *Hickey*, 917 F.2d at 904. Damrah concedes that the "evidence at trial (including the parties' stipulations) established that the government preserved the videotapes intact *after* they were seized from Dr. Sami Al-Arian's home and business premises in November 1995." Damrah does take issue, however, with how the tapes were made and handled prior to the 1995 seizure. Damrah argues that because the government did not present any evidence that the videotapes accurately depicted what was said and done or evidence that the videos fairly and accurately depicted the events at issue, the videos were inadmissible.

The key question under Federal Rule of Evidence 901 is whether "the matter in question is what its proponent claims." The claim regarding this evidence is that it depicts Damrah and others at ICP/PIJ events where Damrah engaged in fund raising for the organizations. Damrah does not question the fact that he and his words are depicted in the videotapes. The Advisory Notes to Rule 901(b)(4), which provides that evidence may be authenticated by distinctive characteristics, state: "The characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety." Evidence of how the tapes were made and handled prior to their seizure is not required. *Buziashvili v. Inman*, 106 F.3d 709, 717 (6th Cir. 1997) ("[T]he W-2 forms were sufficiently authenticated in that they appeared to be what they purported to be, and defense counsel was not able to make any serious challenge to their authenticity."); *United States v. Kandiel*, 865 F.2d 967, 973-74 (8th Cir. 1989) (tape recordings authenticated without evidence of origin, method, or time of recording). The district court did not abuse its discretion in holding that

the tapes were "self-authenticating, and also to a degree corroborated by some of the other things that counsel for the government referred to."

## F.

Damrah objected to the admission of the official New York State Certificate of Incorporation of Afghan Refugee Services, Inc., which listed Damrah as an incorporator, claiming that under Federal Rule of Evidence 403 the probative value of the document was outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Damrah fails to demonstrate any prejudice. The trial court did not abuse its discretion in admitting this evidence.

## G.

Damrah requested jury instructions on the definitions of "affiliation" and "persecution." Jury instructions are reviewed to determine if the issues and law were fairly submitted to the jury. *United States v. Zidell*, 323 F.3d 412, 427 (6th Cir. 2003)*; United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991); *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984). The trial court did not give part of the requested instruction regarding affiliation. Specifically the court did not instruct the jury that "affiliation means a relationship which is equivalent or equal to that of membership in all but name." Damrah argues that this instruction was approved in *Killian*, 368 U.S. at 254-58, and cited with approval in *Bryson v. United States*, 396 U.S. 64, 69 n.7 (1969). Damrah does not point out that, though the Court in *Killian* found that an instruction including the sentence at issue was not improper, it did find that the specific sentence was contradictory, confusing, and inconsistent. 368 U.S. at 257-58.

Damrah also requested that the jury be instructed that "[w]here private discrimination is neither condoned by the state nor the prevailing social norm, it does not amount to persecution." The district court did not include this requested sentence. This case does not involve any claims of discrimination. The jury instructions taken as a whole fairly submitted the issues to the jury and were not confusing, misleading or prejudicial. *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999). The judgment of the district court is affirmed.

## III.

For the foregoing reasons, we affirm the judgment of the district court.